AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT FILED

for the
Southern District of California

12 MAR -8 AM 10: 03

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| A black Verizon LG cellular telephone | ) |
| MEID HEX: A0000028BD2B64, Model No. | ) |
| LG-VN530, S/N: 102KPCA0846427 | ) |

Case No.  '12 MJ 0851

BY: _____ DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ SOUTHERN _____ District of _____ CALIFORNIA _____ *(identify the person or describe property to be searched and give its location):* SEE ATTACHMENT A-1, incorporated by reference herein as part of the warrant

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* SEE ATTACHMENT B, incorporated by reference herein as part of the warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of _____ 18 _____ U.S.C. § 1512, 1958, et , and the application is based on these facts: SEE AFFIDAVIT, incorporated by reference herein as part of the warrant

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Traniece Jackson, Special Agent with FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3-8-12

_____
*Judge's signature*

City and state: SAN DIEGO, CALIFORNIA

THE HONORABLE NITA L. STORMES
*Printed name and title*

**AFFIDAVIT**

STATE OF CALIFORNIA )
                       ) ss.
COUNTY OF SAN DIEGO )

     I, Traniece Jackson, Special Agent with the Federal Bureau of Investigation (hereinafter referred to as "FBI"), being duly sworn, depose and declare the following:

**I**

**INTRODUCTION**

     1.    I make this Affidavit in support of an Application for a Search Warrant for the following: (1) a black Verizon LG cellular telephone, with telephone number 619-540-4963, as more fully described in **Attachment A-1** (hereinafter the "Target Cell Phone"), which was seized by federal agents on March 2, 2012 upon the arrest of STEVEN MARTINEZ, from the parking lot of his office located at 5830 Oberlin Drive, San Diego, CA 92121, County of San Diego; and (2) an HP Pavillion, dv7 Entertainment PC, laptop computer, as more fully described in **Attachment A-2** (hereinafter the "Target Laptop Computer"), which was seized by federal agents on or about March 3, 2012, from the residence of NORMAN RUSSELL THELLMANN located at 8545 Mission Gorge Road, Space #314, Santee, California 92120.

     2.    On April 14, 2011, a federal grand jury in the Southern District of California returned an Indictment and found probable cause that MARTINEZ committed multiple counts of: Mail Fraud, in violation of 18 U.S.C. § 1341; Procuring False Tax Returns, in violation of 26 U.S.C. § 7206(2); Fraudulent Use of a Social Security Number of Another Person, in violation of 42 U.S.C. § 408(a)(8); Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; Making a False Tax Return, in violation of 26 U.S.C. § 7206(1); Money Laundering, in violation of 18 U.S.C. § 1957; Aiding and Abetting, in violation of 18 U.S.C. § 2; and Criminal Forfeiture. The Indictment is filed in Criminal Case No. 11CR1445-WQH.

     3.    On March 1, 2012, U.S. Magistrate Judge Louisa S. Porter found probable cause that MARTINEZ engaged in two counts of Witness Tampering, in violation of 18 U.S.C. § 1512(a)(1)(A), as evidenced by Magistrate Case No. 12MJ0767.

1

4.     On March 3, 2012, U.S. Magistrate Judge Mitchell D. Dembin found probable cause that THELLMANN engaged in a Conspiracy to Tamper with Wintesses, in violation of 18 U.S.C. § 1512(a)(1)(A) and (k), as evidenced by Magistrate Case No. 12MJ0793.

5.     Based on the facts set forth herein, I submit there is probable cause to believe that MARTINEZ and THELLMANN have committed the following offenses: conspiracy, in violation of 18 U.S.C. § 371; conspiracy to tamper with witnesses and witness tampering, in violation of 18 U.S.C. § 1512; conspiracy to use a facility of interestate commerce in commission of murder-for-hire and use of a facility in interestate commerce to commit murder-for-hire, in violation of 18 U.S.C. § 1958; solicitation of a crime of violence, in violation of 18 U.S.C. § 373; and aiding and abetting, in violation fo 18 U.S.C. § 2.

6.     Based on the facts set forth herein, I submit there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses, as more fully described in **Attachment B,** will be found on the Target Cell Phone and Target Laptop Computer, as more fully described in **Attachments A-1** and **A-2**, respectively.

7.     This affidavit is based upon my personal knowledge and upon information I have gained from several sources, including, but not limited to, interviews of witnesses, surveillance, search warrants, a review of law enforcement databases, information received from other law enforcement personnel, and knowledge gained from my training and experience. Because this affidavit is written and offered for the limited purpose of establishing probable cause for the issuance of a search warrant, it does not contain all of the information that the Government possesses relative to this investigation.

## II

## TRAINING AND EXPERIENCE

8.     I have been employed as a Special Agent with the FBI since 2006.

9.     I am presently assigned to a San Diego Field Office. During my approximately five years as a Special Agent, I have investigated various violent crimes that include, but are not limited to, bank robbery, kidnapping, extortion, murder-for-hire, solicitation for crime of

1   violence and witness tampering, in violation of Title 18, United States Code, Sections 2113,

2   1201, 873, 1958, 373, and 1512, respectively.

3        10.    Prior to becoming a Special Agent, I was employed by the State of California as a

4   fraud investigator between 2001 and 2006.

5        11.    Prior to joining the FBI, I received a bachelor's degree in Accounting from

6   Loyola Marymount University.

7        12.    During the last five years, I have received specialized training in the investigation

8   and prosecution of violent crimes. I am a graduate of the FBI Academy in Quantico, Virginia.

9   As part of this program, I attended four months of criminal investigating training. My training

10  courses included but were not limited to criminal law, constitutional law, and enforcement

11  techniques, including but not limited to, undercover operations and search warrants.

12       13.    Based on my training and experience, I know that violent criminals use

13  computers and cellular telephones to communicate with other suspects regarding violent

14  crimes. I also know that violent criminals use computers and cellular telephones to create

15  digital and electronic data, documents, images, photographs, and other records, which can be

16  used to further a plot to tamper with witnesses and engage in murder-for-hire. Based on my

17  training and experience, I know individuals often maintain such electronic data and records for

18  long periods of time and store such data and records on computers and cellular telephones.

19       14.    I have participated in the execution of approximately 50 search warrants as a FBI

20  Special Agent. Based on my training and experience, and my discussions with other highly

21  experienced Special Agents with FBI, such records and computer data are frequently stored and

22  maintained at locations, such as residences, home offices, garages, briefcases, filing cabinets,

23  closets, storage units, vehicles, computers and computer storage devices, including but not

24  limited to hard drives (internal and external), disks (i.e., CD-rom, DVD-rom, floppy disks), and

25  flash/thumb drives. As a federal agent, I have participated in the drafting and execution of

26  numerous search warrants, including warrants for cellular telephones and computers. I am

27  familiar with the procedures involved in executing search warrants.

28  //

3

15.   My training and experience also indicates that cellular telephones and computers used to commit violent crimes often contain digital information showing these activities taking place, even after the suspect has attempted to erase such information.  Special computer programs can be used by trained computer forensic examiners, to recover this information.  By seizing conducting a forensic examination on their contents, I expect to find valuable digital evidence, thus linking the suspects to the violent crimes.

### III

### FACTS ESTABLISHING PROBABLE CAUSE

**A.    Prior Search Warrants**

16.   On or about March 2, 2011, the Honorable William McCurine Jr., United States Magistrate Judge, issued a search warrant for (1) the premises located at 15859 Rosemont Lane, Ramona, California 92065, (the residence of MARTINEZ), and (2) the premises located at 5830 Oberlin Drive, Suite 300, San Diego, California 92121 (the business of MARTINEZ).  A copy of the search warrants and the supporting affidavits of IRS Special Agent Anthony Lysek, are attached as **Exhibits 1** and **2** and incorporated herein by reference.

17.   As stated in the supporting affidavits in **Exhibits 1** and **2**, MARTINEZ, a former IRS Revenue Agent turned tax preparer, defrauded both his clients and the IRS by stealing more than $11 million in tax payments.  MARTINEZ presented his wealthy clients with completed tax returns indicating that they owed a significant amount of income tax. MARTINEZ convinced his clients to write checks for the tax amounts to an alleged client trust account (instead of directly to the IRS or California Franchise Tax Board).  Rather than deposit these checks into a true client trust account, MARTINEZ deposited the checks into five different nominee bank accounts.  To conceal his theft, MARTINEZ filed a different set of bogus tax returns indicating that the clients owed little or no income tax.   MARTINEZ transferred the proceeds of his fraud from the five nominee bank accounts to other bank accounts he controlled, various associates, several attorneys for legal fees, and mainly, to fund his extravagant lifestyle, including an airplane, boat, and multi-million dollar home in Ramona, California.

**B.     The Official Proceeding in Criminal Case No. 11CR1445-WQH**

18.     On April 14, 2011, a federal grand jury in the Southern District of California returned a 49-count indictment charging MARTINEZ with Mail Fraud, in violation of 18 U.S.C. § 1341; Procuring False Tax Returns, in violation of 26 U.S.C. § 7206(2); Fraudulent Use of a Social Security Number of Another Person, in violation of 42 U.S.C. § 408(a)(8); Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; Making a False Tax Return, in violation of 26 U.S.C. § 7206(1); Money Laundering, in violation of 18 U.S.C. § 1957; Aiding and Abetting, in violation of 18 U.S.C. § 2; and Criminal Forfeiture.

19.     On April 18, 2011, MARTINEZ was arraigned on the Indictment and entered a not guilty plea.  Thereafter, the Court set conditions of release requiring the posting of a $350,000 personal appearance bond secured by real property, global position monitoring (GPS), no-contact with victims/witnesses, and other special conditions.

20.     On April 21, 2011, MARTINEZ was released on bond and placed on GPS monitoring.

21.     On May 31, 2011, the Court held a motion hearing and granted a continuance for defense counsel to review discovery.  The Court issued a protective order regarding discovery on October 13, 2011.

22.     On November 28, 2011, MARTINEZ filed a motion to modify his conditions of release, to include the removal of GPS monitoring and to allow contact with certain victim/witnesses.   On December 13, 2011, over the Government's objection, the Court modified MARTINEZ's bond and removed the active GPS monitoring.  The Court ordered monitoring by voice ID system.  In addition, the Court permitted MARTINEZ to have contact with certain victim/witnesses in his pending criminal case.

23.     After several requests to continue the motion hearing, the Court set a motion hearing for March 19, 2012 at 2:00 p.m.

/ /

/ /

/ /

5

C.    **Murder-For-Hire Plot and Witness Tampering**

24.    Approximately two weeks before February 28, 2012, MARTINEZ contacted a former employee at the employee's residence, located within the Southern District of California.

   a.  MARTINEZ provided the former employee with four packages of documents containing personal identifying information about four separate individuals, including Marianne Harmon, Stephen Harmon, Monique Siegel, and Jonathan Smith. MARTINEZ also provided color photographs of Ms. Harmon and of Ms. Siegel's condominium. The photographs of Ms. Siegel's condominium were marked up with notations such as "front door" and "patio."

   b.  MARTINEZ told the former employee something to the effect of "that bitch, Harmon, wore a wire" and recorded their conversations. The former employee was aware that MARTINEZ was presently under indictment for what he referred to as "tax charges" and claimed he was present at MARTINEZ's home during the IRS raid.

   c.  MARTINEZ told the former employee he could make him rich for the rest of his life, $100,000 cash, if he eliminated the "lady in Rancho Santa Fe" and the "lady in La Jolla." The information MARTINEZ provided showed that Ms. Harmon lives in Rancho Santa Fe and that Ms. Siegel lives in La Jolla. The FBI confirmed both victims' addresses.

   d.  MARTINEZ also suggested that the former employee use two different pistols for the murders and that he acquire a silencer.

25.    On February 28, 2012, the former employee contacted the San Diego Division of the FBI to report the potential murder-for-hire plot by MARTINEZ.

26.    On February 29, 2012, the former employee met with agents of the FBI and remitted the documentation provided by MARTINEZ. The former employee also reported that MARTINEZ contacted him via cellular telephone and set up a second meeting for March 1, 2012 at 7:30 a.m. at the former employee's residence.

a. Based upon the investigation and speaking with law enforcement and other federal employees, it was confirmed that Marianne Harmon, Stephen Harmon, Monique Siegel, and Jonathan Smith were key witnesses against MARTINEZ in a multi-count indictment in: <u>United States v. Steven Martinez</u>, Criminal Case No. 11CR1445-WQH, which is pending trial in the United States District Court for the Southern District of California.

27.   On March 1, 2012, MARTINEZ went to the former employee's residence within the Southern District of California.  This meeting was audio and video recorded by FBI.

a. At the meeting, MARTINEZ offered the former employee $100,000 to kill Marianne Harmon and Monique Siegel.  MARTINEZ told the former employee to get rid of the documentation, because if law enforcement found the documents, he "would be dead."

b. MARTINEZ provided additional information about how to best enter Monique Siegel's residence, including information about her gate, which is typically unlocked, and her sliding door, which is typically kept open.

c. MARTINEZ also clarified that the $100,000 payment was not just for Marianne Harmon, and possibly her husband (Stephen Harmon), but also for "the Old Tree."  Monique Siegel is 86 years old.

d. MARTINEZ explained that he expected law enforcement to contact him regarding the murders and expressed concern that the remaining witnesses would be provided protection by law enforcement, given their connection to his pending criminal case.

e. MARTINEZ also explained that after the former employee committed the murders, he should contact MARTINEZ's business associate, "Norm" (later identified by FBI through its investigation and surveillance as NORMAN RUSSELL THELLMANN), at a particular telephone number and provide a code to receive the payment.  MARTINEZ wrote down "Norm" and "Norm's" telephone number and left it with the former employee.

f. The meeting concluded with MARTINEZ's assumption that the former employee would carry out MARTINEZ's wishes within the next 48 hours.

**D.  Arrest of MARTINEZ**

28.    On March 1, 2012, Magistrate Judge Louisa S. Porter signed the complaint and arrest warrant for MARTINEZ.  On March 2, 2012, at approximately 1:30 p.m., FBI arrested MARTINEZ outside of his business on Oberlin Drive.  FBI seized the Target Cell Phone from MARTINEZ and transported MARTINEZ to FBI for processing.

**E.    Telephone Call with THELLMANN**

29.    On March 2, 2012, at approximately 5:00 p.m., the former employee made a recorded telephone call to THELLMANN.

a. During the recorded call, the former employee dialed the telephone number of THELLMANN given to him by MARTINEZ during their meeting on March 1, 2012.  The former employee confirmed that he was speaking with "Norm." THELLMANN acknowledged that he knew the former employee as the person "working with Steve."

b. The former employee told THELLMANN that he had a question regarding the job that he had with MARTINEZ concerning the "two ladies in San Diego." THELLMANN twice claimed that Martinez did not mention anything to him about that.  The former employee then said that he agreed with MARTINEZ that THELLMANN was the one who was going to pay him the money. THELLMANN responded: "Yes. Yes. Yes. Yes."  The former employee asked how he was going to be paid because the job was going to be done soon. THELLMANN told the former employee that he was not in Santee at that moment.

c. The former employee said that THELLMANN was supposed to have a code number.  THELLMANN laughed, and said that he did not have the code number, but rather that the person that called him was supposed to have the code number.  THELLMANN said that he was supposed to receive the code

1   number in person.  The former employee said: "Oh, so you already know

2   about this."  THELLMANN said: "Yeah. I know about it. . . But I'm not

3   supposed to, uh, my instructions are, I'm not supposed to do anything until the

4   person tells me what the code number is."  THELLMANN then told the

5   former employee that he could meet him later that night after he got back to

6   Santee.

7       d.  The former employee asked THELLMANN how he could get the money

8   because the job was almost done. THELLMANN responded: "You can meet

9   me tonight and pick it up. . . I should be home around seven.  I can go home

10   and, uh, and get those cigars for ya, and put 'em in a bag. And I can meet you

11   at someplace in Santee."  After learning that the former employee was

12   currently in El Cajon, THELLMANN told him that they could meet outside at

13   the Costco in Santee.

14       e.  THELLMANN told the former employee that he knew how much money to

15   pay him.  When asked how much money, THELLMANN said that he was not

16   going to say the amount on the telephone.  The former employee said he

17   wanted to make sure he was going to receive the correct amount of money

18   since he was doing this special for MARTINEZ.  THELLMANN responded:

19   "Yeah. Don't worry about it. You will receive what you are supposed to

20   receive. I just don't want to talk about these things on the phone. That's all."

21   THELLMANN and the former employee agreed to speak again around 7:00

22   p.m.  Thereafter, the call ended.

23   **F.  Arrest of THELLMANN**

24       30.  On March 2, 2012, at approximately 3:00 p.m., the FBI released a press release

25   announcing the arrest of MARTINEZ and the details concerning his involvement in witness

26   tampering.  Given the release of this public information, FBI was concerned that evidence

27   could be destroyed and THELLMANN may flee.  Given the exigency of the situation, danger

28   to the community, and seriousness of the crime, at approximately 8:45 p.m., FBI arrived at

THELLMANN's residence in Santee and arrested THELLMANN based on probable cause that he was involved in a conspiracy to tamper with witnesses. FBI transported THELLMANN to the Santee Sheriff Station for processing.

31.     On March 2, 2012, at approximately 9:45 p.m., I advised THELLMANN of his Miranda rights, as witnessed by FBI Special Agent Hector Luna. The interview was video recorded. THELLMANN acknowledged that he understood his Miranda rights, and agreed to waive his rights and speak with FBI without an attorney present.

       a.   THELLMANN said that he has known MARTINEZ for approximately three years. THELLMANN said he purchased a limousine from MARTINEZ for $5,000, and that he would drive MARTINEZ and his friends around. MARTINEZ paid him to drive him around.

       b.   FBI confronted THELLMANN about his involvement with MARTINEZ in a scheme to tamper with witnesses. While THELLMANN denied knowing about a scheme to tamper with witnesses, THELLMANN admitted that earlier on March 2, 2012, he received a call from a person claiming that MARTINEZ wanted THELLMANN to pay the person money. At first, THELLMANN claimed he could not understand the person and that he would call him back later that evening. However, after listening to the recorded call between THELLMANN and the former employee, THELLMANN then claimed that he knew he was to receive a code from the former employee and that after confirming the code, THELLMANN would pay the former employee approximately $40,000. THELLMANN continued to deny knowing why he was paying the former employee $40,000 on behalf of MARTINEZ. THELLMANN assumed he was paying an "attorney under the table" for legal services.

       c.   THELLMANN told FBI that within the last year, he met MARTINEZ at his home in Ramona, and MARTINEZ gave THELLMANN approximately $42,500 in cash. MARTINEZ told THELLMANN, in the presence of

MARTINEZ's wife, that THELLMANN should not give the money back to him and that THELLMANN should hold onto the money for MARTINEZ in case MARTINEZ's wife needed money in the future. THELLMANN said that a few days before March 2, 2012, he met with MARTINEZ and MARTINEZ told him that a person was going to call him within the next 72 hours with a code, which was THELLMANN's birthday, and that THELLMANN should give the person $40,000. THELLMANN reminded MARTINEZ that he had told him to hold the money for MARTINEZ's wife. MARTINEZ said that he knew he told him that, but that THELLMANN should just give the person the money.

d. THELLMANN also told FBI that MARTINEZ gave THELLMANN a laptop computer to hold for him. THELLMANN claimed that he could not recall when MARTINEZ gave him the laptop computer. THELLMANN said he hid the laptop computer behind his bookcase in his residence.

32. On March 2, 2012, THELLMANN signed a consent form giving FBI permission to search his residence in Santee. At approximately 12:20 a.m., FBI conducted a consensual search of THELLMANN's residence and seized $42,400 in cash in a cereal box hidden in the kitchen cupboards, the Target Laptop Computer hidden behind a bookcase, and an external hard drive that belonged to THELLMANN.

## IV

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

33. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### Seizure and Retention of Instrumentalities

a. Based upon the foregoing, there is probable cause to believe that any computers and other electronic storage devices encountered during this search are

11

instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2), Fed.R.Crim.P., or were used in committing crime as provided at Rule 41(c)(3). Consequently, the computers and any other electronic storage devices are subject to seizure, retention and possible forfeiture and destruction. Computers, other electronic storage devices and media confirmed onsite to contain contraband, constitute fruits of crime or to have been used to commit crime will not be returned but will be imaged offsite and analyzed as provided beginning at subparagraph (c) below. The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality. Computers and other electronic storage devices and media that are not confirmed onsite as instrumentalities will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (b) below.

b.      The offsite imaging and preliminary analysis of computers, other electronic storage devices and media to confirm their status as instrumentalities will be conducted within forty five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

c.      Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of the requested data

1 | to be obtained by the owner.  If the request is denied, the owner will be directed to Rule 41(g),

2 | Federal Rules of Criminal Procedure.

3 | Identification and Extraction of Relevant Data

4 |         d.     A forensic image is an exact physical copy of the hard drive or other

5 | media. After obtaining a forensic image, the data will be analyzed to identify and extract data

6 | subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the

7 | forensic image can be a highly technical process requiring specific expertise, equipment and

8 | software. There are literally thousands of different hardware items and software programs, and

9 | different versions of the same program, that can be commercially purchased, installed and

10 | custom-configured on a user's computer system.   Computers are easily customized by their

11 | users.   Even apparently identical computers in an office environment can be significantly

12 | different with respect to configuration, including permissions and access rights, passwords, data

13 | storage and security.   It is not unusual for a computer forensic examiner to have to obtain

14 | specialized hardware or software, and train with it, in order to view and analyze imaged data.

15 |         e.     Analyzing the contents of a computer or other electronic storage device,

16 | even without significant technical issues, can be very challenging.  Searching by keywords, for

17 | example, often yields many thousands of hits, each of which must be reviewed in its context by

18 | the examiner to determine whether the data is within the scope of the warrant.  Merely finding a

19 | relevant hit does not end the review process.  The computer may have stored information about

20 | the data at issue:  who created it, when and how it was created or downloaded or copied, when

21 | was it last accessed, when was it last modified, when was it last printed and when it was

22 | deleted. Sometimes it is possible to recover an entire document that never was saved to the hard

23 | drive if the document was printed.  Moreover, certain file formats do not lend themselves to

24 | keyword searches.   Keywords search text.   Many common electronic mail, database and

25 | spreadsheet applications do not store data as searchable text.  The data is saved in a proprietary

26 | non-text format. Documents printed by the computer, even if the document never was saved to

27 | the hard drive, are recoverable by forensic programs but not discoverable by keyword searches

28 | because the printed document is stored by the computer as a graphic image and not as text.

1  Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a
2  particular relevant piece of data does not exist in a vacuum. To determine who created,
3  modified, copied, downloaded, transferred, communicated about, deleted or printed the data
4  requires a search of other events that occurred on the computer in the time periods surrounding
5  activity regarding the relevant data. Information about which user had logged in, whether users
6  share passwords, whether the computer was connected to other computers or networks, and
7  whether the user accessed or used other programs or services in the time period surrounding
8  events with the relevant data can help determine who was sitting at the keyboard.

9        f.      It is often difficult or impossible to determine the identity of the person
10 using the computer when incriminating data has been created, modified, accessed, deleted,
11 printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers
12 generate substantial information about data and about users which generally is not visible to
13 users. Computer-generated data, including registry information, computer logs, user profiles
14 and passwords, web-browsing history, cookies and application and operating system metadata,
15 often provides evidence of who was using the computer at a relevant time. In addition,
16 evidence such as electronic mail, chat sessions, photographs and videos, calendars and address
17 books stored on the computer may identify the user at a particular, relevant time. The manner
18 in which the user has structured and named files, run or accessed particular applications, and
19 created or accessed other, non-incriminating files or documents, may serve to identify a
20 particular user. For example, if an incriminating document is found on the computer but
21 attribution is an issue, other documents or files created around that same time may provide
22 circumstantial evidence of the identity of the user that created the incriminating document.

23        g.      Analyzing data has become increasingly time-consuming as the volume of
24 data stored on a typical computer system and available storage devices has become mind-
25 boggling. For example, a single megabyte of storage space is roughly equivalent of 500
26 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is
27 roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now
28 being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.

14

And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

h.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days from the date of seizure pursuant to this warrant, absent further application to this court.

i.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

<u>Genuine Risks of Destruction</u>

j.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

<u>Prior Attempts to Obtain Data</u>

k.     The United States has not attempted to obtain this data by other means.

<u>User-Attribution</u>

l.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded or downloaded solely by reviewing the

incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

## V

## REQUEST TO SEAL AFFIDAVIT

34.   Because this is an ongoing investigation, your affiant requests this search warrant affidavit be sealed until such time as the Court orders otherwise. Disclosure of the search warrant affidavit at this time would seriously jeopardize the ongoing investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution.

## VI

## CONCLUSION

35.   Based on the facts above, my training and experience, and a review of the documents and other relevant information that I believe is reliable, I submit there is probable cause to believe that evidence, fruits and instrumentalities of violations of federal law, including: conspiracy, in violation of 18 U.S.C. § 371; conspiracy to tamper with witnesses and witness tampering, in violation of 18 U.S.C. § 1512; conspiracy to use a facility of interestate commerce in commission of murder-for-hire and use of a facility in interestate commerce to commit murder-for-hire, in violation of 18 U.S.C. § 1958; solicitation of a crime of violence, in

1  violation of 18 U.S.C. § 373; and aiding and abetting, in violation fo 18 U.S.C. § 2.; as set forth

2  in **Attachment B**, will be found on the Target Cell Phone, as more fully described in

3  **Attachment A-1**, and on the Target Laptop Computer, as more fully described in **Attachment**

4  **A-2**.

5       36.    In consideration of the foregoing, I respectfully request that this Court issue a

6  search warrant for the Target Cell Phone and Target Laptop Computer, fully described in

7  **Attachment A-1** and **Attachment A-2**, respectively, for the items fully described in

8  **Attachment B**.

9

10  Dated this 8th day of March 2012

11

12  Traniece Jackson

Special Agent

13  Federal Bureau of Investigation

14

15  Subscribed and sworn to before me

16  This 8th day of March, 2012, at San Diego, California.

17

18

19

HONORABLE NITA L. STORMES

20  United States Magistrate Judge

Southern District of California

21

22

23

24

25

26

27

28

17

# Exhibit 1

AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

11 MAR -2 PM 2:41

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* .  15859 Rosemont Lane, Ramona, California 92065 County of San Diego | )  )  )  )  )  )  ) |

Case No.   '11 ██ 0730

DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Southern_____ District of _____California_____ *(identify the person or describe property to be searched and give its location):*

See Attachment A-1 (incorporated herein)

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___26___ U.S.C. § _7206, 7201_ , and the application is based on these facts:

See Affidavit (incorporated herein); the search is also related to violations of 18 U.S.C. 1341 (mail fraud), 1343 (wire fraud), 1956 and 1957 (money laundering, and 1028A (aggravated identity theft).

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ANTHONY LYSEK, Special Agent with IRS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/2/11

_____
*Judge's signature*

City and state:  San Diego, California

WILLIAM MCCURINE, Jr., United States Magistrate Judge
*Printed name and title*

SW-000051





AO 93 (Rev. 01/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   '11 ███ 0730 |
| | ) |
| 15859 Rosemont Lane, | ) |
| Ramona, California 92065 | ) |
| County of San Diego | ) |

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

  See Attachment A-1 (incorporated herein)

    The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

  See Attachment B (incorporated herein)

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

    **YOU ARE COMMANDED** to execute this warrant on or before _____ March 17, 2011 _____
                                                                       *(not to exceed 10 days)*

    ☑ in the daytime  6:00 a.m. to 10 p.m.   ☐ at any time in the day or night as I find reasonable cause has been established.

    Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_WILLIAM MCCURINE, Jr._____ .
          *(name)*

    ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
        ☐until, the facts justifying, the later specific date of _____ .

Date and time issued: _3/?/11  14:00hrs_      _[signature]_____
                                                           *Judge's signature*

City and state:   _San Diego, California_      _WILLIAM MCCURINE, Jr., United States Magistrate Judge_
                                                            *Printed name and title*

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>11 **0730** | Date and time warrant executed:<br>3/3/11    10:40 A.m. | Copy of warrant and inventory left with:<br>CYNTHIA MARTINEZ |
| Inventory made in the presence of :<br>LIZ ZARONI-PISSOT | | |
| Inventory of the property taken and name of any person(s) seized:<br><br>SEE INVENTORY LISTING OF ALL ITEMS SEIZED<br>AT 15854 ROSEMONT LN. RAMONA, CA ATTACHED. | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  3/16/11

_____
Executing officer's signature

ANTHONY LYSEK  SPECIAL AGENT
Printed name and title

SW-000053

## ATTACHMENT A-1

## DESCRIPTION OF PREMISED TO BE SEARCHED

*Residence of Steven Martinez, 15859 Rosemont Lane, Ramona, California 92065, County of San Diego (the Target Residence)*

1.   The residence of Steven Martinez and Cynthia L. Martinez is located on the corner of Mussey Grade Road and Rosemont Lane in Ramona, California 92065.   The residence is a single family, multi-story dwelling with light colored stucco and a grey roof. The residence has a multi-car garage. The residence is located on approximately 3.4 acres.  There is a large front lawn with a gazebo with a white roof and a children's swingset with multiple slides.  There is a large backyard with a pool, which contains a grotto, swim-up bar, jacuzzi, and beach area.   The backyard also contains two rectangular metal storage containers and a separate residence structure.  The property is surrounded by a fence with an entrance gate at the driveway.   The entrance gate, which is located on Rosemont Lane, contains a split grey scrolled iron gate with the letter "M" in gold on each side of the gate.  A post mounted grey mailbox located on Rosemont Lane next to a telephone pole a few yards from the gate bear the address "15859 Rosemont Lane" in white lettters.



SW-000054





Page 2 of 2

SW-000055



## ATTACHMENT B

## ITEMS TO BE SEIZED

1. The items to be seized are evidence of fraud, money laundering, filing false tax returns, tax evasion, filing false claims with the United States, and aggravated identity theft relating to the following persons and entities:

STEVEN MARTINEZ
STEVEN MARTINEZ, CPA, AN ACCOUNTANCY CORPORATION
GOERTZ & MARTINEZ
GOERT-MARTINEZ
EFTPS-2007 INC.
EFTPS-2008 INC
VIA BRAZIL, INC.
AAA FINANCIAL SERVICES
AABS INC.
ACCURATE UNDERGROUND & GRADING INC.
ALKI CAPITAL MANAGEMENT
ALL WATER TEK INC.
AMERICAN CORPORATE REGISTER
ANGUS TOBIASON
ANN CAPOZZA
ANTHONY CAPOZZA
ARTHUR TOBIASON
ATLAS TICKETS
BLUE SUN MARKETING INC.
CAPSTONE GROUP LLC
CAPSTONE INVESTMENTS INC.
CAPSTONE PARTNERS
CATHY ANDREWS
CDAC, INC.
CHICAGO TITLE
CHRIS PARSONS
CONCRETE CREATIONS INC.
CYNTHIA MARTINEZ
DAN MUSETTI & Co.
DAVID KUPFER
DAVID ROGERS
DENNIS HOTTENSTEIN

SW-000056

DIANE SMITH
DONALD MARTINS ELECTRICAL
ELITE SURGICAL CENTERS, DEL MAR L.P.
ENVIROSCAPES
ERNEST GARCIA
ERNIE GARCIA
ESTRADA LANDSCAPING
EXPRESS AIR CHARTER
FIRST HAWAII FINANCIAL, INC.
GLENN ABADIR
HALLMARK ESCROW
HARMON CONTRACTING COMPANY
JOE LIBERTY
JOHN V. SMITH
JONATHAN D. SMITH
KENNETH NOORIGIAN
LEVEL ONE MARKETING
LORETTA ABADIR
MANUFACTURED STRUCTURES INTERNATIONAL
MSI
MARIANNE HARMON
MEENA SMITH
MIDWEST SUPPLY CENTER INC.
MONIQUE SIEGEL
MSI PLANT OPERATIONS
NEW AGE GLOBAL INC.
NEW AGE INTERNATIONAL INC.
NIP & TUCK LLC
OUTPATIENT SURGERY OF DEL MAR LLC
PACIFIC PLAYGROUNDS
PEDRO DANIEL FERRETTI
PERRY ABADIR
PHILIP HERR
POINT LOMA SURGICAL CENTER
SANDPIPER DATA SYSTEMS INC.
SANDPIPER WORLDWIDE INC.
SCOTT WILFONG
SKYLAR-HALEY LP
STEPHEN HARMON

SW-000057

STEVEN CAPOZZA
SURGICAL VENTURES INC.
THRESHOLD AIR CHARTER
TOBIASON BROTHERS
WEIS ELECTRIC INC.
W.F.E. LTD.
2011 HOLDINGS INC.

and any name variations of such individuals and entities for the period from January 1, 2004 through the present, unless other noted, limited to:

a. **Tax Returns and Publications** – For tax years 2004 through 2008, all Federal and State of California tax returns (including all related schedules, forms, worksheets, and attachments for all tax returns for individuals, corporations, partnerships, S-corporations, trusts, and estates), employment tax returns, information returns, tax documents and publications. These documents include but are not limited to:

   i. U.S. Individual Income Tax Returns (Forms 1040, 1040A, 1040EZ, and 1040X) and Related Schedules (Schedule A, B, C, D, E, and K-1);

   ii. U.S. Corporation Income Tax Returns (Forms 1120 and 1120-S);

   iii. Forms W-2 and W-4

   iv. State of California Income Tax Returns (Forms 540, 540A, 540EZ, and 540NR);

   v. State of California Corporation Franchise or Income Tax Return (Forms 100 and 100S); and

   vi. IRS Publications, IRS tax code, California Franchise Tax Board Publications, California tax code, and material from tax related seminars or courses.

b. **Tax Documents** – All documents and records related to the preparation of client tax returns for tax years 2004 through 2008, including but not limited to receipts and documentation for deductions, entity business records and receipts for expenditures, client questionnaires, client worksheets, and client interview/call notes and memoranda.

SW-000058

c.     **Tax Payments by Clients** – All documents and records related to the payment by clients for federal and state estimated taxes and taxes due and owing, including but not limited to copies of checks received from clients.

d.     **Customer Lists and Client Information** – Customer lists and client information including all client files, appointment books, address books, diaries, planners, Rolodexes, interviewing sheets, or any documents and records related to interviews with clients.

e.     **Client Records for Payment of Services** – All documents and records including but not limited to receipts, receipt books, journals, ledgers, and bills showing charges to clients and payment from clients for tax and accounting services rendered by STEVEN MARTINEZ for tax years 2004 through 2008.

f.     **Accounting and Financial Records** – All accounting records including all income statements, balance sheets, general ledgers, subsidiary ledgers, trial balances, ledgers of cash disbursements, accounts payable, accounts receivable, Quicken or Quickbooks records, all tax related information, Lacerte records, and all other spreadsheets, summaries, and compilations of accounting and financial information.

g.     **Bank and Financial Statement Records** – All statements and records for bank or financial accounts at domestic or foreign banks, savings and loans, credit unions, securities brokers, or other financial institutions under any name. The records include all cancelled checks, check registers, deposit slips, confirmation slips, signature cards, bank cards, credit cards, and any documents related to the origin of all deposited items for all deposits, debit and credit memos, and documents related to wire transfers.

h.     **Loan Documents** – Promissory notes, loan agreements, amortization or repayment schedules, mortgages, and any documents related to collateral or security repayments for all loans.

i.     **Documents Related to Dominion and Control or Involvement** – Documents and articles of personal property evidencing identity of persons with dominion and control or those occupying, possessing, owning, frequenting, or involved in the premises to be searched.  These documents include rental agreements, lease records, property acquisition records, mortgage statements, real estate tax records, utility and telephone bills and receipts, Internet bills, keys, mail envelopes, certified mail receipts, postage stamp meters, stamps containing address and personal information, stamps containing the address of the Internal Revenue Service, storage records, correspondence, mail service carrier records

SW-000059

(including records of offsite mailboxes and post office boxes), and safety deposit records.

j.   **Correspondence from the Internal Revenue Service and/or California Franchise Tax Board for the above-listed individuals and/or entities.**

k.   **Correspondence between the above-listed individuals and/or entities** – This includes e-mails, letters, facsimiles, and any document indicating a mailing or shipment to STEVEN MARTINEZ and any of his businesses.

l.   **Cash** – Cash will be photographed and counted on the premises. Cash will not be seized.

m.   **Documents Related to the Receipt and Disbursement of Cash** – This includes credit card statements, receipts, invoices, bills, records of commercial storage, records of personal storage, records of home improvements, records of home construction, records of vehicles, bank reconciliations, bank statements, cash reconciliations, and corresponding records.

n.   **Forensic Images of Computers and Computer Data** – This includes any and all forensic images of STEVEN MARTINEZ's computers and computer data, including but not limited to the forensic images taken pursuant to a civil action on behalf of Anthony and Ann Capozza, through their attorneys, Keesal, Young, & Logan, plc., in 2009.

which evidence will tend to prove the commission of (1) Filing False Tax Returns, in violation 26 U.S.C. § 7206, (2) Tax Evasion, in violation of 26 U.S.C. § 7201, (3) Filing False Claims with the United States, in violation of 18 U.S.C. § 287, (4) Mail and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, (5) Money Laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and (6) Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.

As used throughout this list of items to be seized, the terms "items," "documents" and "records" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including any floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

SW-000060

Authorization is sought to search for and seize evidence of fraud, money laundering, filing false tax returns, tax evasion, and aggravated identity theft relating to the following persons and entities listed above in paragraph 1. Authorization to search includes any detached structures from the primary premises if such additional structures exist. This authorization includes the search of physical documents and includes electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with the "Procedures For Electronically Stored Information" provided in the affidavit submitted in support of this warrant. Items to be seized include the following:

a.      All computer systems, software, peripherals and data storage devices.

b.      All documents, including all temporary and permanent electronic files and records, relating to any and all of the items described in paragraph 1 above.

c.      User-attribution data to include data reflecting who used or controlled the computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed. User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.

SW-000061

## AFFIDAVIT

STATE OF CALIFORNIA      )
                         )   ss.
COUNTY OF SAN DIEGO      )

I, Anthony Lysek, Senior Special Agent, United States Internal Revenue Service (hereinafter referred to as "IRS"), being duly sworn, depose and declare the following:

## I

## INTRODUCTION

1.      I make this Affidavit in support of an Application for a Search Warrant for the following: (1) the premises located at 15859 Rosemont Lane, Ramona, California 92065, County of San Diego (the Target Residence), the residence of STEVEN MARTINEZ, as more fully described in **Attachment A-1**, and (2) the premises located at 5830 Oberlin Drive, Suite 300, San Diego, California 92121, County of San Diego (the Target Business), the business office of STEVEN MARTINEZ, as more fully described in **Attachment A-2**.

2.      Based on the facts set forth herein, I submit there is probable cause to believe that STEVEN MARTINEZ has committed the following offenses during at least tax years 2004 through 2008: filing false tax returns, in violation of 26 U.S.C. § 7206; tax evasion, in violation of 26 U.S.C. § 7201; filing false claims with the United States, mail fraud, wire fraud, money laundering, and aggravated identity theft associated with the filing of false tax returns, all in violation of 18 U.S.C. §§ 287, 1341, 1343, 1956, 1957, and 1028A, respectively.

3.      Based on the facts set forth herein, I also submit there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses, as more fully described in **Attachment B**, will be found at the Target Residence, as more fully described in **Attachment A-1**, and the Target Business, as more fully described in **Attachment A-2**.

4.      This affidavit is based upon information obtained from several sources, including, but not limited to, cooperating witnesses, a review of IRS databases, a review of federal and State of California income tax return information, information received from other IRS personnel, and knowledge gained from my training and experience.  Because this affidavit is

1

1  written and offered for the limited purpose of establishing probable cause for the issuance of

2  search warrants, it does not contain all of the information that the government possesses

3  relative to this investigation.

## II

## TRAINING AND EXPERIENCE

6      5.      I have been employed as a Special Agent with the IRS since 1991.

7      6.      I am presently assigned to a Criminal Investigative group located in San Marcos,

8  California, which is in San Diego County.  During my approximately 19 years as a Special

9  Agent, I have investigated numerous cases, including tax evasion, tax fraud, mail fraud, wire

10  fraud, money laundering, and identity theft.

11      7.      Prior to becoming a Special Agent, I received a Master of Arts degree in Business

12  Administration from San Diego State University.

13      8.      During the last 19 years, I have received specialized training in the investigation

14  and prosecution of criminal and civil tax violations.  I am a graduate of the Federal Law

15  Enforcement Training Center (FLETC) in Glynco, Georgia.  As part of this program, I attended

16  six months of criminal investigating training.  My training courses included but were not

17  limited to criminal law, constitutional law, and enforcement techniques, including but not

18  limited to, undercover operations and search warrants.  This training also encompassed

19  classroom training on the principles of federal taxation of individuals, corporations, and

20  partnerships, including analyzing tax returns, filing requirements, statutes of limitation, gross

21  income, inclusions and exclusions, deductions and losses.

22      9.      From my training and experience, I know that it is an established principle of

23  federal tax law that income is generally taxed to the person or entity who earns, benefits from,

24  and directs the use of, such income.  Moreover, 26 U.S.C. § 61 defines gross income as "all

25  income from whatever source derived," including compensation for services and gross income

26  obtained from a client.

27      10.    From my training and experience, I know that it is an established principle of tax

28  law that a tax return preparer and/or a Certified Public Accountant (CPA) who collects

SW-000063

1    estimated tax payments or tax payments due upon the filing of a tax return on behalf of a client

2    has a duty to remit those tax payments to the federal and state governments (i.e., IRS and

3    California Franchise Tax Board) pursuant to federal and state law.

4        11.    Based on my training and experience, I know that the amount of income reported

5    to the State of California must be consistent with the amount of income reported to the federal

6    government because the State of California requires that a copy of the corresponding federal

7    income tax return be attached to the filed California State tax return. Based on my training and

8    experience, I know that maximum tax rates on personal income assessed by the federal

9    government are more than three times the maximum tax rate assessed by the State of California.

10   I also know that the amount of federal estimated income tax payments and actual federal

11   income tax due upon filing of a federal tax return are usually significantly higher than the

12   estimated and actual tax payments due upon the filing of a California State tax return on the

13   same amount of income.

14       12.    Based on my training and experience, I know that income tax liability can

15   frequently be determined by reviewing and examining various business and financial records,

16   such as general ledgers, subsidiary ledgers, cash receipts journals, cash disbursement journals,

17   payroll journals, bank records, receipts, invoices, worksheets, schedules, forms, calendars, logs,

18   and tax returns. Furthermore, I know that individuals and businesses often keep such records,

19   even if they were not used for the preparation of tax returns. Based on my training and

20   experience, I know that individuals often maintain such records for long periods of time. Such

21   records are used for loans, investments, credit card applications, estate and financial planning.

22       13.    I have participated in the execution of approximately 20 search warrants as an

23   IRS Special Agent. On virtually every occasion, I sought general ledgers, subsidiary ledgers,

24   cash receipts journals, cash disbursement journals, payroll journals, bank records, receipts,

25   invoices, worksheets, schedules, forms, calendars, logs, tax returns, computer discs, and

26   computer-generated data. Based on my training and experience, and my discussions with other

27   highly experienced Special Agents with IRS, such records and computer data are frequently

28   stored and maintained at business locations and other locations, such as residences, home

SW-000064

1  offices, garages, briefcases, filing cabinets, closets, storage units, vehicles, computers and

2  computer storage devices, including but not limited to hard drives (internal and external), disks

3  (i.e., CD-rom, DVD-rom, floppy disks), and flash/thumb drives.

4       14.   Based on my training and experience, I am familiar with schemes commonly

5  employed by tax preparers who file false tax returns and commit tax fraud, tax evasion, mail

6  fraud, wire fraud, money laundering, identity theft, and other fraud-related offenses.  I know

7  that these types of crimes are ongoing in nature and the perpetrators will engage in this activity

8  on a continuing basis.  I know that computers, printers, scanners and related equipment are

9  often used to produce false tax returns, false identification documents, and financial records.  I

10  also know such computer equipment is often used to communicate with victims and co-

11  conspirators regarding the fraudulent activities.  Such computer equipment is a valuable tool to

12  a fraud suspect and will often be kept in the suspect's residence, garage, storage area, or

13  vehicle.

14       15.   My training and experience also indicates that computers used to commit tax fraud,

15  tax evasion, mail fraud, wire fraud, money laundering, identity theft, and other fraud-related

16  crimes, often contain digital information showing the fraudulent activities taking place, even after

17  the suspect has attempted to erase such information.  Special computer programs can be used by

18  trained computer forensic examiners, to recover this information.  By seizing any and all

19  computers and computer data on the premises and conducting a forensic examination on their

20  contents, I expect to find valuable digital evidence, thus linking the suspect to the creation of, or

21  communication regarding the filing of false tax returns with the federal and state government.

22  **III**

23  **STATEMENT OF FACTS AND PROBABLE CAUSE**

24  **A.**   **Background**

25       16.   According to IRS personnel records, on or about July 5, 1988, STEVEN

26  MARTINEZ joined the IRS and became a Revenue Agent in Oceanside, California.  On or

27  about January 18, 1992, STEVEN MARTINEZ resigned from the IRS to join a public

28  accounting firm.

4

17.    According to California Board of Accountancy, STEVEN MARTINEZ has been a licensed Certified Public Accountant (CPA) in California for over 17 years. According to an employee of STEVEN MARTINEZ, STEVEN MARTINEZ formed a tax preparation business with Kenneth Goertz, in San Diego, California, in 1998. The entity was known as Goertz & Martinez LLP and was originally located at 5755 Oberlin Drive, San Diego, California 92121.

18.    According to an employee of STEVEN MARTINEZ, in or about 2003, STEVEN MARTINEZ established an independent tax preparation business under the name STEVEN MARTINEZ, CPA, An Accountancy Corporation. At this time, Kenneth Goertz also formed an independent tax preparation business. However, STEVEN MARTINEZ and Kenneth Goertz continued to share office space at 5755 Oberlin Drive, San Diego, California 92121.

19.    According to an employee of STEVEN MARTINEZ, in October 2007, STEVEN MARTINEZ and Kenneth Goertz moved their offices from 5755 Oberlin Drive to 5830 Oberlin Drive, Suite 300, San Diego, California 92121. STEVEN MARTINEZ and Kenneth Goertz have separate space located within Suite 300, including separate offices and filing cabinets. According to IRS records, surveillance, and witness statements, STEVEN MARTINEZ presently conducts his tax return business at 5830 Oberlin Drive, Suite 300, San Diego, California 92121.

20.    According to IRS records, business records, and witness statements, for tax years 2003 through 2007, STEVEN MARTINEZ prepared hundreds of federal income tax returns for his clients, including returns for individuals, corporations, and partnerships. STEVEN MARTINEZ also prepared state income tax returns for his clients.

**B.    The Scheme to Defraud Taxpayer-Clients**

21.    Based on the information and records gathered from the investigation, it is my opinion that from at least 2003, STEVEN MARTINEZ engaged in a scheme to defraud both his clients and the IRS. According to IRS records, business records, witness statements and other documents, STEVEN MARTINEZ prepared two sets of tax returns for a group of his clients. STEVEN MARTINEZ provided his clients with the first set of tax returns showing a significant amount of income and tax due. This first set of tax returns also reflected the amount of

5

1   estimated tax payments made by the client during the tax year and, in some cases, showed an

2   additional tax due as a remittance with the filed tax return. STEVEN MARTINEZ instructed

3   his clients to make checks payable for estimated federal and state income taxes to one of four

4   entities (GOERTZ & MARTINEZ CTA Inc.; GOERT-MARTINEZ CTA Inc.; EFTPS-2007

5   Inc.; EFTPS-2008 Inc.), none of which were associated with the IRS or the California

6   Franchise Tax Board (FTB). In contrast, STEVEN MARTINEZ prepared a second set of tax

7   returns showing a greatly reduced amount of income, tax due, and estimated tax payments

8   made by the client. STEVEN MARTINEZ filed with the IRS this second set of tax returns

9   without the clients' knowledge. Among other things, it is my belief that STEVEN MARTINEZ

10  diverted the funds he collected from his clients for federal and state taxes he was supposed to

11  remit to the IRS and State of California and used those funds for his own personal use.

12      22.    An employee of STEVEN MARTINEZ stated that STEVEN MARTINEZ

13  utilized the services of Philip Herr to establish more than fifty (50) entities. According to

14  business records, some of these entities include: 2011 Holdings, Inc., Manufactured Structures

15  International (aka MSI), Nip & Tuck LLC, Via Brazil Inc., and CDAC, Inc. Many of the

16  entities have the registered address as: 711 South Carson Street, Carson City, Nevada 89701.

17  In executing his scheme to defraud his clients, IRS records show that STEVEN MARTINEZ

18  used this same address, on many of the false federal income tax returns that he filed with the

19  IRS, as the client's home address, when in fact it was not the client's home address.

20      23.    According to Bank of America records, STEVEN MARTINEZ utilized five

21  different nominee bank accounts (including one time deposit account) during the years 2004

22  through 2008 in order to deposit his client's estimated tax payments and other tax due

23  remittances when the tax returns were filed. Based on an analysis of IRS records and business

24  records, during the period from 2004 through 2008, STEVEN MARTINEZ deposited at least

25  $11 million in payments from nine different clients into one or more of the five nominee bank

26  accounts in the names of one of these five entities: GOERTZ & MARTINEZ CTA, GOERT-

27  MARTINEZ CTA, EFTPS-2007 Inc., EFTPS-2008 Inc., and Via Brazil Inc. It has been

28  established through client interviews, proffers, bank records and other documents that clients of

SW-000067

1  STEVEN MARTINEZ wrote checks payable to these entities for either estimated tax payments
2  or tax payments due upon the filing of federal and California State income tax returns. Based
3  on the interviews of eight clients, each client stated that they made their checks payable to these
4  entities at the instruction of STEVEN MARTINEZ and with the understanding that STEVEN
5  MARTINEZ would remit the tax payments to the IRS and FTB on their behalf.

6      24.   According to business records and witness interviews, the bank accounts in the
7  name of EFTPS-2007 Inc. and EFTPS-2008 Inc. established at Bank of America were used by
8  STEVEN MARTINEZ to deposit payments from clients of his tax preparation business. The
9  signature cards on file with Bank of America for the accounts listed Ernest Garcia as the only
10 owner and authorized signer on the accounts. Mr. Garcia was shown signature cards for the
11 two Bank of America accounts, EFTPS-2007 Inc., and EFTPS-2008 Inc., each bearing his
12 name, address and social security number. Mr. Garcia was listed as an authorized signer on the
13 accounts and each signature card had what appeared to be the signatures of Mr. Garcia. Mr.
14 Garcia looked at the signature on the EFTPS-2007 Inc. signature card and said that the
15 signature, "Ernest S. Garcia" was made by him. Mr. Garcia looked at the signature on the
16 EFTPS-2008 Inc. signature card and said that the signature, "Ernie Garcia" was not signed by
17 him. Mr. Garcia said he was not aware of any business accounts opened with his name. Mr.
18 Garcia said that his friend, STEVEN MARTINEZ, had once asked him to sign a document in
19 order to put his name (Ernest Garcia) on a bank account in case anything happened to STEVEN
20 MARTINEZ or his family so that Mr. Garcia would have access to the funds. Mr. Garcia
21 recalled signing such a document for STEVEN MARTINEZ. Mr. Garcia said he has known
22 STEVEN MARTINEZ for about 20 years and he did not question him about the bank account.
23 Mr. Garcia is not aware of the name on the bank account and has never seen any bank records
24 related to the bank account. Mr. Garcia was shown a series of checks which were drawn on the
25 EFTPS-2007 Inc. and EFTPS-2008 Inc. accounts at Bank of America. Mr. Garcia said he has
26 never seen these checks and that he did not sign the checks nor did he make any deposits to the
27 EFTPS-2007 Inc. or EFTPS-2008 Inc. accounts at Bank of America.

28 //

7

SW-000068

1    _(1)    Clients – Anthony and Ann Capozza_

2    25.    According to IRS records, business records, witness interviews, and other

3    documents, STEVEN MARTINEZ prepared federal and California State income tax returns for

4    his clients Anthony Capozza and Ann Capozza for tax years 2004 through 2007. Mr. and Mrs.

5    Capozza told federal agents that they owned three business entities during this period, which

6    impacted their federal tax returns: Capstone Investments Inc., Capstone Group LLC, and

7    Capstone Partners.

8    26.    According to the federal tax returns for tax years 2004 through 2007 that

9    STEVEN MARTINEZ prepared and presented to Mr. and Mrs. Capozza, the amount of tax due

10   on those federal tax returns indicated that Mr. and Mrs. Capozza owed federal income taxes of

11   approximately $690,000 in total for tax years 2004 through 2007. Mr. and Mrs. Capozza stated

12   that STEVEN MARTINEZ would instruct them to write out checks during the year for

13   estimated income taxes and also income tax due when the tax returns were prepared and ready

14   to be filed. According to business records and witness interviews, during the period from

15   August 2, 2004 to June 12, 2008, Mr. and Mrs. Capozza made checks for federal and state

16   income taxes payable to EFTPS-2007 Inc., EFTPS-2008 Inc., GOERTZ & MARTINEZ CTA

17   and GOERT-MARTINEZ CTA at the direction of STEVEN MARTINEZ, totaling

18   approximately $695,000. In contrast to the federal tax returns presented to Mr. and Mrs.

19   Capozza, the federal tax returns filed by STEVEN MARTINEZ with the IRS for Mr. and Mrs.

20   Capozza indicated that Mr. and Mrs. Capozza owed only $184,871 in federal income taxes.

21   27.    An analysis of the five nominee bank accounts indicates that Mr. and Mrs.

22   Capozza's checks for tax payments were deposited into the nominee accounts.   Furthermore,

23   according to IRS records, the total amount of payments that were remitted to Mr. and Mrs.

24   Capozza's IRS account by STEVEN MARTINEZ for tax years 2004 through 2007 was no more

25   than $33,428. According to FTB records the total amount of payments that were remitted to

26   Capozza's FTB account by STEVEN MARTINEZ for tax years 2004 through 2007 was no

27   more than $19,134. This indicates that at least $642,438 of the $695,000 in tax payments made

28   to STEVEN MARTINEZ was not paid over to the IRS or the FTB.

8

SW-000069

28.    Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Anthony and Ann Capozza that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

### (2)    Client – Monique Siegel

29.    According to IRS records, business records, witness interviews, and other documents, STEVEN MARTINEZ has prepared federal and California State income tax returns for his client Monique Siegel for more than 10 years, including tax years 2004 through 2007. Ms. Siegel told federal agents that she owns a small apartment complex with approximately 20 rental units from which she generates rental income that is reported on her personal tax returns.

30.    According to IRS records, STEVEN MARTINEZ did not include any of the rental income or activity from the apartment complex on the federal tax returns that STEVEN MARTINEZ filed for Ms. Siegel for tax years 2004 through 2006. For tax year 2007, STEVEN MARTINEZ did not file a federal tax return for Ms. Siegel. However, Ms. Siegel stated that STEVEN MARTINEZ presented a 2007 federal income tax return to her, which she believed STEVEN MARTINEZ had filed on her behalf. Ms. Siegel said that she discovered that STEVEN MARTINEZ had not filed a federal tax return for tax year 2007 only after she hired a new CPA who attempted to amend her tax return for 2007.

31.    According to the federal tax returns for tax years 2004 through 2007 that STEVEN MARTINEZ prepared and presented to Ms. Siegel, the amount of income and tax due on those federal tax returns indicated that Ms. Siegel owed taxes of approximately $200,000 over the four-year period. According to business records and witness interviews, during the period from April 12, 2004 to April 10, 2007, Ms. Siegel made checks for federal income taxes payable to EFTPS-2007 Inc. and GOERTZ & MARTINEZ CTA at the direction of STEVEN MARTINEZ, totaling $162,296. In contrast to the federal tax returns presented to Ms. Siegel, the federal tax returns filed by STEVEN MARTINEZ with the IRS for Ms. Siegel indicated that she owed approximately $4,000 in taxes over the four-year period. Furthermore, according to IRS records, the total amount of payments that were remitted to Ms. Siegel's IRS account by

SW-000070

STEVEN MARTINEZ for tax years 2004 through 2007 totaled approximately $3,528, as of December 2008. In late 2008, Ms. Siegel discovered that STEVEN MARTINEZ had filed false tax returns in her name and that her tax payments had not been remitted to the IRS for the last four years. After Ms. Siegel confronted STEVEN MARTINEZ with the knowledge he had had not remitted her tax payments to the IRS, STEVEN MARTINEZ thereafter made one additional federal tax payment to Ms. Siegel's IRS account for tax year 2007 on December 28, 2008 in the amount of $74,000. Similarly, STEVEN MARTINEZ made payments totaling approximately $23,998 on December 15, 2008 to the FTB for Ms. Siegel's 2005 and 2006 California income tax due, which was more than a year after Ms. Siegel had given her tax payments to STEVEN MARTINEZ to remit to the FTB.

32.     An analysis of the five nominee bank accounts indicates that Ms. Siegel's checks for tax payments were deposited into the nominee accounts. According to IRS records, the total amount payments that were remitted to Ms. Siegel's IRS account by STEVEN MARTINEZ for tax years 2004 through 2007 was approximately $77,528. According to FTB records the total amount of payments that were remitted to Ms. Siegel's FTB account for tax years 2004 through 2007 was approximately $40,810. This indicates that even after STEVEN MARTINEZ was confronted by Ms. Siegel, STEVEN MARTINEZ still failed to pay over to the IRS and FTB at least $43,958 of the $162,296 in tax payments that Ms. Siegel had made to STEVEN MARTINEZ.

33.     Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Monique Siegel that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

### (3)     Clients – John and Meena Smith

34.     According to IRS records, business records, witness interviews, and other documents, STEVEN MARTINEZ prepared federal and California State income tax returns for his clients John V. Smith and Meena Smith for tax years 2004 and 2006. Mr. and Mrs. Smith stated that STEVEN MARTINEZ would instruct them to write out checks during the tax year

SW-000071

1  for estimated income taxes and also income tax due when the tax returns were prepared and
2  ready to be filed.

3      35.    According to business records and witness interviews, Mr. and Mrs. Smith made
4  checks for federal and state income taxes payable to EFTPS-2007 Inc. and GOERTZ &
5  MARTINEZ CTA Inc. at the direction of STEVEN MARTINEZ, for the 2004 and 2006 tax
6  years totaling approximately $1,626,093. In contrast to the federal tax returns presented to Mr.
7  and Mrs. Smith, the 2004 and 2006 federal tax returns filed by STEVEN MARTINEZ with the
8  IRS for Mr. and Mrs. Smith indicated that Mr. and Mrs. Smith owed a total of approximately
9  $45,593 in federal income taxes.

10     36.    An analysis of the five nominee bank accounts indicates that Mr. and Mrs.
11  Smith's checks for tax payments were deposited into the nominee accounts.  According to IRS
12  records, the total amount of payments remitted to Mr. and Mrs. Smith's IRS account by
13  STEVEN MARTINEZ for tax years 2004 and 2006 was no more than $5,494.  According to
14  FTB records, the total amount of payments remitted to Mr. and Mrs. Smith's FTB account for
15  tax years 2004 and 2006 was no more than $4,979.  This indicates that at least $1,615,620 of
16  the $1,626,093 in tax payments made by Mr. and Mrs. Smith to STEVEN MARTINEZ was not
17  paid over to the IRS or the FTB.

18     37.    Based on an analysis of records obtained during the investigation, there is
19  probable cause to believe that STEVEN MARTINEZ used the majority of funds from John V.
20  Smith and Meena Smith that were deposited into the nominee banks accounts for his own
21  personal use (as summarized in Table A below).

22     *(4)    Clients – Stephen and Marianne Harmon*

23     38.    According to IRS records, business records, and other documents, STEVEN
24  MARTINEZ prepared the tax returns for his clients Stephen Harmon and Marianne Harmon for
25  tax year 2006.  According to business records and other documents, Mr. and Mrs. Harmon
26  owned a corporation during this period: Harmon Contracting Company.

27     39.    According to the federal tax return for tax year 2006 that STEVEN MARTINEZ
28  presented to Mr. and Mrs. Harmon, the amount of income reported and tax due on that federal

SW-000072

1  tax return indicated that Mr. and Mrs. Harmon had income of approximately $20,703,874 and
2  owed taxes of approximately $3,389,815. According to business records, during the period
3  from September 15, 2006 through October 12, 2007, Mr. and Mrs. Harmon made several
4  checks for federal and state income taxes payable to EFTPS-2007 Inc. and GOERT-
5  MARTINEZ CTA Inc., totaling approximately $4,900,000. Included in these payments was
6  check #6581, which was made payable to EFTPS-2007 Inc. in the amount of $1,332,000.
7  Check #6581 was dated January 11, 2007 and the memo field indicated that the payment was
8  for "IRS Form 1040-ES 2006," which refers to the form used by individual taxpayers to send
9  the IRS estimated tax payments. In contrast to the federal tax return presented to Mr. and Mrs.
10  Harmon, the 2006 federal tax returns filed by STEVEN MARTINEZ with the IRS for Mr. and
11  Mrs. Harmon indicated that Mr. and Mrs. Harmon had income of approximately $2,131,864
12  and owed taxes of approximately $562,614.

13      40.    An analysis of the five nominee bank accounts indicates that Mr. and Mrs.
14  Harmon's checks for tax payments were deposited into the nominee accounts. According to
15  IRS records, the total amount of payments remitted to Mr. and Mrs. Harmon's IRS account by
16  STEVEN MARTINEZ for tax year 2006 was approximately $519,000. According to FTB
17  records the total amount of payments that were remitted to Mr. and Mrs. Harmon's FTB
18  account for tax year 2006 was approximately $181,033. This indicates that at least $4,199,967
19  of the $4,900,000 in tax payments made to STEVEN MARTINEZ was not paid over to the IRS
20  or the FTB.

21      41.    Based on an analysis of records obtained during the investigation, there is
22  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Stephen
23  and Marianne Harmon that were deposited into the nominee banks accounts for his own
24  personal use (as summarized in Table A below).

25      *(5)    Clients – Glenn and Loretta Abadir*

26      42.    According to IRS records, business records, witness interviews, and other
27  documents, STEVEN MARTINEZ prepared personal and corporate tax returns for his clients
28  Glenn and Loretta Abadir for tax years 2004 through 2007. Mr. Abadir stated to federal agents

12

SW-000073

1  that he owned two corporations during this period: New Age International Inc. in 2005 and
2  2006, and New Age Global in 2007.   Mr. Abadir also stated that STEVEN MARTINEZ
3  maintains the books and records of his businesses. Mr. Abadir stated that STEVEN
4  MARTINEZ did not provide Mr. and Mrs. Abadir with any copies of the personal or corporate
5  tax returns to keep for their own records.

6      43.    Mr. Abadir stated that STEVEN MARTINEZ instructed him to write out checks
7  during the tax year for estimated income taxes and taxes due when the tax returns were
8  prepared and ready to be filed. According to business records and statements made by Mr. and
9  Mrs. Abadir, Mr. and Mrs. Abadir made checks for federal and state income taxes payable to
10 EFTPS-20007 Inc., and GOERTZ & MARTINEZ CTA Inc., totaling approximately $426,070,
11 for tax years 2004 through 2007.

12     44.    An analysis of the five nominee bank accounts indicates that Mr. and Mrs.
13 Abadir's checks for tax payments were deposited into the nominee accounts. According to IRS
14 records, the total amount of payments that were remitted to Mr. and Mrs. Abadir's IRS account
15 by STEVEN MARTINEZ for tax years 2004 through 2007 was no more than $468.  According
16 to FTB records, the total amount of payments that were remitted to Mr. and Mrs. Abadir's FTB
17 account by STEVEN MARTINEZ for tax years 2004 through 2007 was no more than $4,877.
18 This indicates that at least $420,725 of the $426,070 in tax payments made by Mr. and Mrs.
19 Abadir to STEVEN MARTINEZ was not paid over to the IRS or the FTB.

20     45.    Based on an analysis of records obtained during the investigation, there is
21 probable cause to believe that STEVEN MARTINEZ used the majority of funds from Glenn
22 and Loretta Abadir that were deposited into the nominee banks accounts for his own personal
23 use (as summarized in Table A below).

24     *(6)     Client – Cathy Andrews*

25     46.    According to IRS records, business records, witness interviews, and other
26 documents, STEVEN MARTINEZ prepared personal and corporate tax returns for his client
27 Cathy Andrews for tax years 2005 through 2007. Ms. Andrews told federal agents that she
28 owned a corporation during this period, Sandpiper Data Systems Inc. This corporation's name

SW-000074

1  was changed by STEVEN MARTINEZ from Sandpiper Data Systems Inc. to Sandpiper
2  Worldwide Inc. Ms. Andrews also stated that STEVEN MARTINEZ sent tax returns prepared
3  for her personally and for Sandpiper Data Systems to the IRS and the FTB, but he did not
4  provide Ms. Andrews with any copies of the tax returns to keep for her own records.

5      47.    The personal federal tax returns filed by STEVEN MARTINEZ with the IRS for
6  Ms. Andrews for tax years 2005 through 2007 indicated that taxes due over the three-year
7  period totaled approximately $33,000 and were more than satisfied by the approximately
8  $51,000 of federal payroll taxes withheld from the wages of Ms. Andrews. The personal
9  federal tax returns filed by STEVEN MARTINEZ with the IRS for Ms. Andrews for the years
10  2005 through 2007 also indicated that no tax payments had been made by Ms. Andrews other
11  than from withheld payroll taxes. The personal income tax returns filed by STEVEN
12  MARTINEZ for Ms. Andrews indicated a refund was due to Ms. Andrews for each of the tax
13  years 2005 through 2007. The tax returns filed by STEVEN MARTINEZ indicated that the
14  refund should be applied to Ms. Andrews' subsequent year's tax liability. In addition, the
15  federal corporate income tax returns filed by STEVEN MARTINEZ for Sandpiper Data
16  Systems indicated that Ms. Andrews owed federal corporate income taxes of approximately
17  $500 for tax years 2005 through 2007, and no estimated federal tax payments were made for
18  the corporation.

19      48.    Despite not owing any significant additional personal or corporate income taxes
20  for tax years 2005 through 2007, Ms. Andrews stated that STEVEN MARTINEZ instructed her
21  to write out checks during the tax year for estimated income taxes and taxes due when the tax
22  returns were prepared and ready to be filed. According to business records and statements from
23  Ms. Andrews, Ms. Andrews made checks for taxes payable to EFTPS-2007 Inc., EFTPS-2008
24  Inc., and GOERTZ & MARTINEZ CTA Inc., totaling approximately $417,350, for tax years
25  2005 through 2007. Ms. Andrews stated these payments were made for both federal and state
26  income taxes based upon the instructions that she received from STEVEN MARTINEZ.
27  //
28  //

14

49. An analysis of the five nominee bank accounts indicates that Ms. Andrews' checks for tax payments were deposited into the nominee accounts. According to IRS records, no tax payments were remitted to the account of Ms. Andrews for tax years 2005 through 2007. According to FTB records, the total amount of payments that were remitted to Ms. Andrew's FTB account by STEVEN MARTINEZ for tax years 2005 through 2007 was no more than $1,159. This indicates that at least $416,191 of the $417,350 in tax payments made by Ms. Andrews to STEVEN MARTINEZ was not paid over to the IRS or the FTB.

50. Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Cathy Andrews that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

### (7)    Clients – Jonathan and Diane Smith

51. According to IRS records, business records, witness interviews, and other documents, STEVEN MARTINEZ prepared personal tax returns for his clients Jonathan D. Smith and Diane Smith for tax years 2004 through 2006. Mr. Smith told federal agents that he owned a business during the relevant period: Level One Marketing. Mr. Smith also told federal agents that he was a partner, with Perry Abadir, in a food brokerage called Blue Sun Marketing.

52. According to business records, during the period from December 22, 2004 through April 27, 2006, Mr. and Mrs. Smith made checks payable to GOERTZ & MARTINEZ CTA and GOERT-MARTINEZ CTA Inc., totaling approximately $328,137. According to IRS records, the federal tax returns filed by STEVEN MARTINEZ with the IRS indicted that Mr. and Mrs. Smith owed taxes of approximately $34,000 for tax years 2004 through 2006. Approximately $32,000 of the $34,000 in taxes due was paid to the IRS through federal payroll withholding taxes on wages earned by Mr. and Mrs. Smith.

53. An analysis of the five nominee bank accounts indicates that Mr. and Mrs. Smith's checks for tax payments were deposited into the nominee accounts. According to IRS records, the total amount of payments remitted to Mr. and Mrs. Smith's IRS account by STEVEN MARTINEZ for tax years 2004 through 2006 was no more than $9,973, as of

15

1  December 2008.  According to FTB records, the total amount of payments remitted to Mr. and
2  Mrs. Smith's FTB account for tax years 2004 through 2006 was no more than $8,140.

3      54.    In late 2008, Mr. Smith discovered STEVEN MARTINEZ had filed false returns
4  in his name and that his tax payments had not been remitted to the IRS for the years 2004
5  through 2006.  After Mr. Smith, through his attorney, demanded repayment, STEVEN
6  MARTINEZ mailed two cashier's checks totaling approximately $499,228 payable to "Internal
7  Revenue Service" to Mr. Smith on or about October 10, 2008 for the tax payments that
8  STEVEN MARTINEZ received from Mr. Smith but had not remitted to the IRS or FTB.  The
9  payment also covered some interest and penalties which were incurred as a result of not paying
10  over the money when it was due years earlier.  This indicates that prior to STEVEN
11  MARTINEZ being confronted with a demand letter from Mr. Smith's attorney in late 2008, at
12  least $310,024 of the $328,137 in tax payments which were made by Mr. and Mrs. Smith to
13  STEVEN MARTINEZ in 2004 through 2006 had not been paid over to the IRS or the FTB.

14      55.    Based on an analysis of records obtained during the investigation, there is
15  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Jonathan
16  D. and Diane Smith that were deposited into the nominee banks accounts for his own personal
17  use (as summarized in Table A below).

18      *(8)*    *Client – Dr. David Kupfer*

19      56.    According to IRS records, business records, and other documents, STEVEN
20  MARTINEZ prepared personal tax returns for his client Dr. David Kupfer for tax years 2005
21  through 2007.  According to records obtained during the investigation, Dr. Kupfer was a
22  partner and affiliate with the following entities during the relevant period: David Kupfer M.D.
23  APC, Surgical Ventures Inc., Point Loma Surgical Center, Elite Surgical Centers, Del Mar L.P.,
24  and Outpatient Surgery of Del Mar LLC.

25      57.    According to business records, during the period from April 7, 2006 through June
26  6, 2008, Dr. Kupfer made checks payable to GOERTZ & MARTINEZ CTA and GOERT-
27  MARTINEZ CTA Inc., totaling approximately $1,476,064.  According to IRS records, the
28  federal tax returns filed by STEVEN MARTINEZ with the IRS for Dr. Kupfer indicated that

SW-000077

1    Dr. Kupfer owed personal federal income taxes of approximately $417,628 over the three-year

2    period.

3        58.    An analysis of the five nominee bank accounts indicates that Dr. Kupfer's checks

4    for tax payments were deposited into the nominee accounts.  According to IRS records, the

5    total amount of payments remitted to Dr. David Kupfer's IRS account by STEVEN

6    MARTINEZ for tax years 2005 through 20007 was no more than $291,959.  According to FTB

7    records, the total amount of payments that were remitted to Dr. David Kupfer's FTB account by

8    STEVEN MARTINEZ for tax years 2005 through 2007 was no more than $61,796.  This

9    indicates that at least $1,122,309 of the $1,476,064 in tax payments made by Dr. Kupfer to

10   STEVEN MARTINEZ was not paid over to the IRS or the FTB.

11       59.    Based on an analysis of records obtained during the investigation, there is

12   probable cause to believe that STEVEN MARTINEZ used the majority of funds from Dr.

13   David Kupfer that were deposited into the nominee banks accounts for his own personal use (as

14   summarized in Table A below).

15       *(9)*    *Client – Steven Capozza*

16       60.    According to IRS records, business records, and other documents, STEVEN

17   MARTINEZ prepared the tax returns for his client Steven Capozza for tax years 2005 through

18   2007.  According to business records, during the period from October 13, 2006 through

19   November 2, 2007, Steven Capozza made checks payable to EFTPS-2007 Inc. and GOERT-

20   MARTINEZ, totaling approximately $191,000.  According to IRS records, the 2005 and 2007

21   federal tax returns filed by STEVEN MARTINEZ with the IRS for Steven Capozza indicated

22   that client Steven Capozza owed approximately $117,000 in federal income taxes.

23       61.    An analysis of the five nominee bank accounts indicates that Steven Capozza's

24   checks for tax payments were deposited into the nominee accounts.  However, STEVEN

25   MARTINEZ did not write any checks from those accounts to either the IRS or FTB on behalf

26   of Steven Capozza.  Furthermore, according to IRS records, at least $25,000 paid by Steven

27   Capozza to STEVEN MARTINEZ for taxes and deposited into the nominee bank accounts was

28   not paid to the IRS.

SW-000078

62.   Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Steven Capozza that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

*(10)   Clients – Angus and Arthur Tobiason*

63.   According to IRS records, business records, and other documents, STEVEN MARTINEZ prepared personal tax returns for his clients Angus G. Tobiason and Arthur W. Tobiason for tax year 2007. STEVEN MARTINEZ also prepared a partnership tax return for the brothers' partnership, Tobiason Brothers.

64.   The partnership tax return for Tobiason Brothers, which STEVEN MARTINEZ prepared and filed with the IRS, indicated no income from the business other than a capital gain of $18,389, which resulted from the sale of vacant land that was acquired for approximately $1,741,611 on April 2, 2007 and was sold about three months later on July 6, 2007 for $1,760,000. However, according to the San Diego County property records, the land that was sold by the Tobiason Brothers on July 6, 2007 for $1,760,000 was but not acquired on April 2, 2007, but rather was acquired by the Tobiason Brothers on or about March 19, 1999, when a deed to the land was recorded with San Diego County. Moreover, the San Diego County property records also indicate the price at which the Tobiason Brothers acquired the land was approximately $690,000, and not $1,741,611 as indicated on the tax return filed by STEVEN MARTINEZ. There is no record with the San Diego County Recorder indicating that the Tobiason Brothers acquired this land for $1,741,611 on April 2, 2007. Among other things, there is probable cause to believe that the tax return prepared by STEVEN MARTINEZ understated the capital gain by $1,051,611, which resulted in a tax loss to the IRS in the amount of $157,742 (assuming a 15% tax rate on capital gains in 2007).

65.   According to business records, during the period from August 23, 2007 through December 28, 2007, checks were made from a Tobiason Brothers' bank account to EFTPS-2007, totaling approximately $408,000. In contrast to the filed 2007 federal tax returns, according to IRS records, the 2007 federal personal income tax return that STEVEN

18

SW-000079

1  MARTINEZ prepared and filed with the IRS for Angus and Sally Tobiason indicated that they

2  had approximately $12,800 of total income and zero taxable income.  The 2007 federal

3  personal income tax return that STEVEN MARTINEZ prepared and filed with the IRS for

4  Arthur and Sandra Tobiason also indicated that they had approximately $12,800 in total income

5  and zero taxable income.

6      66.   An analysis of the five nominee bank accounts indicates that Angus and Arthur

7  Tobiason's checks for payments were deposited into the nominee accounts.   However,

8  STEVEN MARTINEZ did not write any checks from those accounts to either the IRS or FTB

9  on behalf of Angus or Arthur Tobiason.  Despite receiving an alleged loan document from

10  Angus and Arthur Tobiason, which claims that Angus and Arthur Tobiason entered into a loan

11  agreement with STEVEN MARTINEZ for a total of approximately $408,000, it is my belief

12  that at least $157,742 of the approximately $408,000 paid by Angus and Arthur Tobiason to

13  STEVEN MARTINEZ was intended for tax purposes and for no other reason.  Among other

14  things, based on my training and experience, there is probable cause to believe that STEVEN

15  MARTINEZ filed false 2007 tax returns for the Tobiason Brothers' partnership and false 2007

16  individual tax returns for Angus and Arthur Tobiason.

17      67.   Based on an analysis of records obtained during the investigation, there is

18  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Angus

19  and Arthur Tobiason that were deposited into the nominee banks accounts for his own personal

20  use (as summarized in Table A below).

21      *(11)    Client – Scott Wilfong*

22      68.   According to IRS records, business records, witness statements, and other

23  documents, STEVEN MARTINEZ prepared a federal personal tax return for his client Scott

24  Wilfong for tax year 2007.  Scott Wilfong told federal agents that he owns a corporation Alki

25  Capital Management LLC.

26      69.   According to business records, Mr. Wilfong made a check on an Alki Capital

27  Management account payable to "EFTPS 2008" on April 30, 2008 in the amount of $75,211.

28  According to IRS records, Mr. Wilfong's payment history with the IRS indicated that only one

SW-000080

1  estimated tax payment of $100,000 was made to the IRS for the tax year 2007, which Mr.
2  Wilfong stated he made directly payable to the IRS.

3      70.    An analysis of the five nominee bank accounts indicates that Mr. Wilfong's
4  $75,211 check for tax payments was deposited into the nominee accounts. Furthermore,
5  according to IRS records, the payment of $75,211 made by Mr. Wilfong to STEVEN
6  MARTINEZ for taxes and deposited into the nominee bank accounts was not paid to the IRS.

7      71.    Based on an analysis of records obtained during the investigation, there is
8  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Scott
9  Wilfong that were deposited into the nominee banks accounts for his own personal use (as
10  summarized in Table A below).

11      *(12)*    *Client – Perry Abadir*

12      72.    According to IRS records, business records, witness statements, and other
13  documents, STEVEN MARTINEZ prepared federal personal, partnership, and corporate tax
14  returns for his client Perry Abadir for tax years 2003 through 2005. According to business
15  records and statements by Perry Abadir to federal agents, Perry Abadir was a partner in Skylar-
16  Haley LP and owned the corporation Blue Sun Marketing Inc. for which STEVEN
17  MARTINEZ prepared federal tax returns during this period.

18      73.    Perry Abadir told federal agents that STEVEN MARTINEZ maintained the books
19  and records for his businesses and maintained all copies of personal, partnership, and corporate
20  tax returns. Federal agents showed Perry Abadir copies of his 2003 and 2005 individual federal
21  tax returns, and Perry Abadir told federal agents that the signatures on the tax returns were not
22  made by him. Perry Abadir was also shown a copy of the 2003 corporate federal tax return for
23  Blue Sun Marketing Inc.; Perry Abadir told federal agents that the signature on the return was
24  not made by him. According to business records, during the period from June 16, 2004 through
25  October 18, 2005, Perry Abadir made checks payable to bank accounts named "GOERTZ &
26  MARTINEZ" and "GOERT-MARTINEZ," totaling approximately $205,152.

27      74.    An analysis of the five nominee bank accounts indicates that Perry Abadir's
28  checks for tax payments were deposited into the nominee accounts. According to IRS records,

SW-000081

1    the total amount payments that were remitted to Perry Abadir's IRS account by STEVEN

2    MARTINEZ for tax years 2003 through 2005 was no more than $4,845. According to FTB

3    records, the total amount of payments that were remitted to Perry Abadir's FTB account by

4    STEVEN MARTINEZ for tax years 2003 through 2005 was no more than $2,802. This

5    indicates that at least $197,505 of the $205,152 in tax payments made by Perry Abadir to

6    STEVEN MARTINEZ was not paid over to the IRS or the FTB.

7         75.    Based on an analysis of records obtained during the investigation, there is

8    probable cause to believe that STEVEN MARTINEZ used the majority of funds from Perry

9    Abadir that were deposited into the nominee banks accounts for his own personal use (as

10   summarized in Table A below).

11   **C.    Disposition of Client Funds**

12        76.    According to business records, during the period from 2004 through 2007,

13   STEVEN MARTINEZ diverted a majority of the more than $11 million in funds deposited

14   into the five nominee bank accounts (GOERTZ & MARTINEZ CTA, GOERT-MARTINEZ

15   CTA, Via Brazil Inc., EFTPS-2007 Inc., and EFTPS 2008 Inc.), for his own personal use.

16   Occasional transfers occurred between these five nominee bank accounts and other bank

17   accounts controlled by STEVEN MARTINEZ, or other individuals associated with him.

18        77.    **Table A** below lists the specific payee or category of expenditure (Transfers,

19   Cashier's check purchases, and Citibank) for which many of the expenditures were made.

20   Almost all of the payees do not appear to have any connection to the IRS or FTB. The category

21   "Citibank" includes payments to several personal credit cards, and a home equity line of credit

22   from Citibank. The category "Transfer to Cal Coast Credit Union Acct ending 7249, 2011

23   Holdings Inc." was a single transfer to fund a checking account in the name 2011 Holdings

24   Inc., owned by STEVEN MARTINEZ. Funds from the 2011 Holdings, Inc. account were used

25   for various purposes, including transfers to other bank accounts, personal expenditures, and tax

26   payments to the IRS and FTB. There were total payments of approximately $637,046 to the

27   IRS and approximately $116,347 to the FTB directly from the 2011 Holdings, Inc. account.

28   The approximately $637,046 in payments made to the IRS included cashier's checks totaling

SW-000082

approximately $499,228, which were made by STEVEN MARTINEZ on behalf of his client, Jonathan Smith, only after Mr. Smith discovered that STEVEN MARTINEZ had not been remitting his tax payments to the IRS, as previously discussed above.  STEVEN MARTINEZ also paid approximately $48,503 to the IRS on behalf of himself and his wife, Cynthia Martinez, from funds in the nominee accounts.

**Table A**

| PAYEE | AMOUNT |
|---|---|
| CITIBANK | 2,011,700.33 |
| Transfer to Cal Coast Credit Union Acct 277249 2011 Holdings Inc. | 2,000,000.00 |
| Cashier's Checks Purchased ** | 936,006.10 |
| Chris Parsons | 548,495.00 |
| Hallmark Escrow –Temecula | 514,000.00 |
| Chicago Title | 509,167.09 |
| First Hawaii Financial Inc. | 448,000.00 |
| Nip & Tuck, LLC | 417,111.85 |
| Steven Martinez CPA, AAC | 405,591.00 |
| Manufactures Structures International | 382,000.00 |
| W.F.E. LTD. | 368,341.82 |
| MSI Plant Operations | 355,000.00 |
| Bank of America | 257,305.00 |
| Estrada Landscaping | 243,146.00 |
| Ramona National Bank | 204,010.00 |
| Pedro Daniel Ferritti | 200,131.00 |
| Midwest Supply Center Inc. | 198,000.00 |
| Joe Liberty | 182,584.00 |
| Enviroscapes | 163,301.31 |

SW-000083

| | |
|---|---|
| All Water Tek Inc. | 118,079.00 |
| Ken Noorigian | 112,000.00 |
| California Bank & Trust | 92,055.00 |
| Accurate Underground & Grading Inc. | 88,202.59 |
| Noorigian & Assoc. Client Trust Acct. | 75,000.00 |
| Atlas Tickets | 74,940.00 |
| Dennis Hottenstein | 72,500.00 |
| Concrete Creations Inc. | 69,000.00 |
| Donald Martins Electrical | 68,855.60 |
| Dan Musetti & Co. | 59,200.00 |
| David Rogers | 55,223.00 |
| Cynthia Martinez | 44,400.50 |
| Threshold Air Charter | 36,040.00 |
| AABS INC. | 32,088.38 |
| Weis Electric Inc. | 28,520.05 |
| American Corporate Register | 25,907.46 |
| Express Air Charter | 23,609.00 |
| Pacific Playgrounds | 23,500.00 |
| AAA Financial Services | 16,124.69 |
| Phil Herr | 15,430.00 |
| **TOTAL** | 11,474,565.77 |
| ** Many Cashier's checks were not available, however the cashier's check category includes checks used for personal purchases and also checks made payable to the IRS or FTB on behalf of clients for whom tax returns were prepared. | |

78.    According to an analysis of the IRS records, bank records, and business records, during the period from 2004 through 2007, less than $1 million of the more than $11 million deposited into the five nominee bank accounts was remitted to the IRS or FTB on behalf of the

SW-000084

1   clients. Funds were remitted to the IRS or FTB, via cashier's checks or through transfers to

2   other bank accounts controlled by STEVEN MARTINEZ, rather than being remitted directly

3   from one of the five nominee accounts to which the clients' checks were originally deposited.

4       79.    According to IRS records, STEVEN MARTINEZ filed his own personal and

5   corporate tax returns for tax years 2003 through 2007 reporting income primarily from his CPA

6   practice, known as Steven Martinez CPA, An Accountancy Corporation. These tax returns

7   were generally filed on time following the year the income was earned. The gross income

8   originally reported during these years varied in the range of approximately $200,000 to

9   $400,000 per tax year.

10       80.    According to IRS records, between June and July 2009, approximately six

11   months after the criminal investigation into STEVEN MARTINEZ begun and after being

12   confronted by several clients, STEVEN MARTINEZ filed five amended federal income tax

13   returns for tax years 2003 through 2007. In these amended federal tax returns, STEVEN

14   MARTINEZ reported an increase in adjusted gross income between $2,000,000 and $5,000,000

15   per tax year. Over the five-year period, the total additional income reported by STEVEN

16   MARTINEZ exceeded $15,000,000, and the total additional tax due exceeded $5,000,000. The

17   source of income listed on the amended returns was not provided.

18       81.    For example, on STEVEN MARTINEZ's 2006 amended federal income tax

19   return, STEVEN MARTINEZ reported an additional $5,000,000 in "other income" with no

20   explanation as to the source of that income. However, STEVEN MARTINEZ included a

21   disclaimer in the amended tax return stating:

22       "The taxpayer husband seeks to insure full and absolute compliance with IRC 61

23       and that any assertion to the contrary is not sustained. Accordingly this amended
tax return is reporting an addition [sic] $5,000,000 in gross income. In the future

24       if the Internal Revenue Service or the taxpayer determines this amended tax
return overstates the taxpayer's income and a reduction to income is the proper

25       course of action, then the Internal Revenue Service will make the necessary

26       adjustment or the taxpayer will file another amended tax return."

27

28       82.    STEVEN MARTINEZ included similar disclaimers on the other amended federal

income tax returns that he filed for tax years 2003, 2004, 2005, and 2007.

24

SW-000085

**D.**     **Probable Cause to Search the Target Business**

83.     Based on the information presented in this affidavit, there is probable cause to believe that evidence of STEVEN MARTINEZ's offenses will be located at the Target Business.

84.     According to a photograph of the door of the Target Business, the door contains the following names: (1) "Steven Martinez, CPA, An Accountancy Corporation;" (2) "Kenneth Goertz, CPA, EA, An Accountancy Corporation;" and (3) "Kenneth C. Noorigian, Esq." According a current employee of STEVEN MARTINEZ, the name "Kenneth C. Noorigian, Esq." was placed on the door of the Target Business in 2010.  Also, according to a current employee of STEVEN MARTINEZ, Kenneth C. Noorigian, Esq., does not maintain an office at the Target Business, and merely has his name printed on the door.

85.     Based on my training and experience, and from conversations with other Special Agents of IRS-CI, I know that business records are frequently prepared by the owner (or employees, family members or other associates) at the business location where the business transactions occurred.  Moreover, financial records such as bank statements, deposit slips, checks, check registers, ledgers, and journals are stored, filed, prepared, and maintained at a business location for long periods of time.  I also know that individuals maintain notes and ledgers indicating income received and expenses incurred in the course of their trade or business at their business location.

86.     Based on my training and experience, and from conversations with other Special Agents of IRS-CI, I also know that business owners, more specifically, income tax return preparers, maintain hard copies and/or electronic copies of client records, including copies of their income tax returns, payment records, contact information and correspondence relating to each client, at their business location.

87.     According to an employee of STEVEN MARTINEZ and a review of IRS and business records, STEVEN MARTINEZ uses Lacerte tax preparation software to prepare his clients' tax returns. STEVEN MARTINEZ does not use any employees to input clients' financial information into the program, but inputs the data himself.  STEVEN MARTINEZ

25

1 maintains a computer in the office located at the Target Business, which he uses to prepare
2 client tax returns. STEVEN MARTINEZ prints the clients' tax returns at his office and mails
3 them to the IRS and State of California for his clients. Therefore, there is probably cause to
4 believe that STEVEN MARTINEZ maintains such tax returns at the Target Business.

5     88.    According to one of STEVEN MARTINEZ's clients, Cathy Andrews, STEVEN
6 MARTINEZ produced to her copies of her tax returns years after the tax returns were originally
7 prepared. Therefore, there is probable cause to believe that either paper or electronic copies of
8 these tax returns are likely to be maintained at his business.

9     89.    According to an attorney for clients Anthony and Ann Capozza, in mid-2009, a
10 federal judge in the Southern District of California issued a court order that permitted clients
11 Anthony and Ann Capozza, through their attorney, to obtain forensic images of STEVEN
12 MARTINEZ's computers located at the Target Business. The court order was issued in a civil
13 case to allow the clients to search for evidence of false tax returns which were filed by
14 STEVEN MARTINEZ on behalf of the clients. Mr. and Mrs. Capozza's attorney made
15 forensic images of the computers located at the Target Business in 2009. Subsequent to making
16 these forensic images, Mr. and Mrs. Capozza and STEVEN MARTINEZ reached a civil
17 settlement in or about September 2009 resulting in a financial payment to the clients and a
18 return of the forensic computer images made by the clients to STEVEN MARTINEZ.
19 Therefore, there is probable cause to believe that STEVEN MARTINEZ maintained copies of
20 these forensic images at his Target Business.

21 **E.**    **Probable Cause to Search the Target Residence**

22     90.    Based on the information presented in this affidavit, there is probable cause to
23 believe that evidence of STEVEN MARTINEZ's offenses will be located in the Target
24 Residence. Based on my training and experience, and from conversations with other Special
25 Agents of IRS-CI, I am aware that it is common for self-employed tax preparers to prepare,
26 maintain, or store business and banking records at their residence, and that individuals also
27 often store records relating to their personal income and finances at their residence.
28 //

26

SW-000087

91.     During an interview of an employee that has worked for STEVEN MARTINEZ and Ken Goertz since 1998, the employee told IRS agents that STEVEN MARTINEZ keeps a limited amount of paper files at the Target Business.  In fact, when she worked with STEVEN MARTINEZ at the prior business location, 5755 Oberlin Drive, San Diego, California 92121, STEVEN MARTINEZ maintained numerous paper files.  In October 2007, when STEVEN MARTINEZ and Ken Goertz moved to the Target Business, the employee stated that she saw several boxes of records that belonged to STEVEN MARTINEZ piled up in the kitchen at the Target Business following the move.  However, the employee told IRS agents that, shortly thereafter, those boxes were removed from the kitchen area and she has not seen them stored anywhere at the Target Business.  In addition, the employee told IRS agents that she has witnessed STEVEN MARTINEZ enter the Target Business carrying a wheeled-briefcase, which may be used for transporting a laptop computer and office files.

92.     The employee of STEVEN MARTINEZ also told IRS agents that she has been to the Target Residence and she has seen STEVEN MARTINEZ's elaborate home office.  The employee said that STEVEN MARTINEZ is often away from the Target Business, even during tax season.  The employee recalled that there were instances when STEVEN MARTINEZ's clients came to the business for an appointment, but STEVEN MARTINEZ was not there.  The employee would call STEVEN MARTINEZ's cell phone to try and locate him for the appointment.

93.     The employee of STEVEN MARTINEZ told IRS agents that when STEVEN MARTINEZ worked at the prior business location at 5755 Oberlin Drive, San Diego, California 92121, he had his home computer system at the Target Residence connected to the Target Business.  According to business records, STEVEN MARTINEZ opened an account with Cox Communications on or about January 2004 for services at the Target Residence.  Cox Communications offers cable and high-speed internet services.  There is probable cause to believe that STEVEN MARTINEZ currently has services provided by Cox Communications at the Target Residence, as evidenced by a payment for a bill associated with STEVEN MARTINEZ's account on or about February 6, 2011 in the amount of approximately $140.00.

27

SW-000088

94.     As discussed above, STEVEN MARTINEZ uses Lacerte tax preparation software to prepare his clients' tax returns.  According to a Lacerte employee, Lacerte software has features available to a user which allows the user to install the software on multiple computers, such as a laptop, and to prepare and print tax returns from multiple locations.  This allows the Lacerte user to prepare tax returns from a location other than a primary business office.

95.     Based on my training and experience, and from conversations with Certified Public Accountants (CPA's), I know that during tax season, which is usually the months just prior to and including the month of April in which federal and state tax returns are due, CPA's work long hours and are often working 7 days per week to satisfy the demand for their services to prepare tax returns prior to the April 15th tax return due date. I also know that it is common for CPA's to contact clients from home and do work for clients from home because of the long hours required to prepare clients' tax returns before the tax return due date.  I also know that it is common for CPA's to maintain electronic and paper copies of clients' tax returns that they have prepared in the last two to three years. I know that this requires the storage of large amounts of electronic and paper records, which are normally maintained on computers and in file cabinets and storages boxes for older records.

96.     According to an employee at the Target Business, STEVEN MARTINEZ does not store large amounts of paper records at the Target Business.  The employee of STEVEN MARTINEZ also told IRS agents that she has seen large storage containers at the Target Residence.  Therefore, there is probable cause to believe that electronic and paper copies are stored at a secure location where they would be easily accessible to STEVEN MARTINEZ, such as a home office.

97.     Based upon the investigation, there is probable cause that STEVEN MARTINEZ currently has a home office at the Target Residence.  On December 5, 2010, CS-1 observed a Hispanic male, approximately 60 years old, accompanied by two young children outside the Target Residence.  At the time, the Hispanic male and two young children were located on the property behind a fence that led to access gates with the letter "M" embossed on them.  Upon being approached by CS-1, the Hispanic male indicated that he worked for the family who lived

28

1    in the Target Residence for approximately 8 years, which made him familiar with the family
2    and the Target Residence. The Hispanic male further stated that the two children with whom
3    he was with were born in the house located on the property. When CS-1 asked whether the
4    owner had an office in the house, the Hispanic male answered in the affirmative saying that,
5    "He's got everything in there." The Hispanic male added that it costs a lot of money to
6    maintain the property, and in fact, the property had its own well located behind the house.
7    When questioned by CS-1 about the type of business that the owner of the house was in, the
8    Hispanic male stated that he could not say very much about that. The Hispanic male did
9    indicate that the owner worked in San Diego, California.

10    98.    Based on my training and experience, it is common for individuals to maintain
11    records for bank accounts and financial records used to maintain illegally obtained funds and
12    the records for the use of such funds in their personal residence where only they have access to
13    such records. Therefore, it is likely that STEVEN MARTINEZ maintains records of bank
14    accounts and financial records at the Target Residence.

15                                            IV

16              **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

17    99.    With the approval of the Court in signing this warrant, agents executing this
18    search warrant will employ the following procedures regarding computers and other electronic
19    storage devices, including electronic storage media, that may contain data subject to seizure
20    pursuant to this warrant:

21                                     Forensic Imaging

22    a.    After securing the premises, or if sufficient information is available pre-
23    search to make the decision, the executing agents will determine the feasibility of obtaining
24    forensic images of electronic storage devices while onsite. A forensic image is an exact
25    physical copy of the hard drive or other media. A forensic image captures all of the data on the
26    hard drive or other media without the data being viewed and without changing the data in any
27    way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to
28    conducting any search of the data for information subject to seizure pursuant to this warrant.

SW-000090

1   The feasibility decision will be based upon the number of devices, the nature of the devices, the
2   volume of data to be imaged, the need for and availability of computer forensics specialists, the
3   availability of the imaging tools required to suit the number and nature of devices found and the
4   security of the search team.  The preference is to image onsite if it can be done in a reasonable
5   amount of time and without jeopardizing the integrity of the data and the safety of the agents.
6   The number and type of computers and other devices and the number, type and size of hard
7   drives are of critical importance.  It can take several hours to image a single hard drive - the
8   bigger the drive, the longer it takes.  As additional devices and hard drives are added, the length
9   of time that the agents must remain onsite can become dangerous and impractical.

10          b.      If it is not feasible to image the data on-site, computers and other
11  electronic storage devices, including any necessary peripheral devices, will be transported
12  offsite for imaging.  After verified images have been obtained, the owner of the devices will be
13  notified and the original devices returned within forty-five (45) days of seizure absent further
14  application to this Court.

15                          Identification and Extraction of Relevant Data

16          c.      After obtaining a forensic image, the data will be analyzed to identify
17  and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the
18  creation of the forensic image can be a highly technical process requiring specific expertise,
19  equipment and software. There are literally thousands of different hardware items and software
20  programs, and different versions of the same program, that can be commercially purchased,
21  installed and custom-configured on a user's computer system.  Computers are easily customized
22  by their users.  Even apparently identical computers in an office or home environment can be
23  significantly different with respect to configuration, including permissions and access rights,
24  passwords, data storage and security.  It is not unusual for a computer forensic examiner to
25  have to obtain specialized hardware or software, and train with it, in order to view and analyze
26  imaged data.

27          d.      Analyzing the contents of a computer or other electronic storage device,
28  even without significant technical challenges, can be very challenging.  Searching by keywords,

30

SW-000091

1  for example, often yields many thousands of hits, each of which must be reviewed in its context

2  by the examiner to determine whether the data is within the scope of the warrant.   Merely

3  finding a relevant hit does not end the review process.   The computer may have stored

4  information about the data at issue:   who created it, when and how it was created or

5  downloaded or copied, when was it last accessed, when was it last modified, when was it last

6  printed and when it was deleted. Sometimes it is possible to recover an entire document that

7  never was saved to the hard drive if the document was printed.   Moreover, certain file formats

8  do not lend themselves to keyword searches.   Keywords search text.   Many common electronic

9  mail, database and spreadsheet applications do not store data as searchable text.   The data is

10  saved in a proprietary non-text format. Documents printed by the computer, even if the

11  document never was saved to the hard drive, are recoverable by forensic programs but not

12  discoverable by keyword searches because the printed document is stored by the computer as a

13  graphic image and not as text.   Similarly, faxes sent to the computer are stored as graphic

14  images and not as text.   In addition, a particular relevant piece of data does not exist in a

15  vacuum. To determine who created, modified, copied, downloaded, transferred, communicated

16  about, deleted or printed the data requires a search of other events that occurred on the

17  computer in the time periods surrounding activity regarding the relevant data.   Information

18  about which user had logged in, whether users share passwords, whether the computer was

19  connected to other computers or networks, and whether the user accessed or used other

20  programs or services in the time period surrounding events with the relevant data can help

21  determine who was sitting at the keyboard.

22          e.      It is often difficult or impossible to determine the identity of the person

23  using the computer when incriminating data has been created, modified, accessed, deleted,

24  printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers

25  generate substantial information about data and about users which generally is not visible to

26  users.   Computer-generated data, including registry information, computer logs, user profiles

27  and passwords, web-browsing history, cookies and application and operating system metadata,

28  often provides evidence of who was using the computer at a relevant time.   In addition,

SW-000092

1   evidence such as electronic mail, chat sessions, photographs and videos, calendars and address

2   books stored on the computer may identify the user at a particular, relevant time. The manner

3   in which the user has structured and named files, run or accessed particular applications, and

4   created or accessed other, non-incriminating files or documents, may serve to identify a

5   particular user. For example, if an incriminating document is found on the computer but

6   attribution is an issue, other documents or files created around that same time may provide

7   circumstantial evidence of the identity of the user that created the incriminating document.

8        f.     Analyzing data has become increasingly time-consuming as the volume of

9   data stored on a typical computer system and available storage devices has become mind-

10  boggling. For example, a single megabyte of storage space is roughly equivalent of 500

11  double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is

12  roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now

13  being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.

14  And, this data may be stored in a variety of formats or encrypted (several new commercially

15  available operating systems provide for automatic encryption of data upon shutdown of the

16  computer). The sheer volume of data also has extended the time that it takes to analyze data.

17  Running keyword searches takes longer and results in more hits that must be individually

18  examined for relevance. And, once reviewed, relevant data leads to new keywords and new

19  avenues for identifying data subject to seizure pursuant to the warrant.

20       g.     Based on the foregoing, identifying and extracting data subject to seizure

21  pursuant to this warrant may require a range of data analysis techniques, including hashing

22  tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data

23  from analysis, such as known operating system and application files. The identification and

24  extraction process, accordingly, may take weeks or months. The personnel conducting the

25  identification and extraction of data will complete the analysis within ninety (90) days of

26  imaging, absent further application to this Court.

27       h.     All forensic analysis of the imaged data will employ search protocols

28  directed exclusively to the identification and extraction of data within the scope of this warrant.

32

SW-000093

### Genuine Risks of Destruction

i.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

j.    In this case, it is my belief that STEVEN MARTINEZ is currently aware of the criminal investigation. There is a genuine risk of destruction of the computer data relating to the tax returns of the above-referenced clients, especially those clients that have already made contact with STEVEN MARTINEZ concerning the falsely filed tax returns. In addition, there is a genuine risk of destruction of the forensic images that were returned to STEVEN MARTINEZ following his civil settlement with clients Anthony and Ann Capozza.

### Prior Attempts to Obtain Data

k.    The United States has not attempted to obtain this data by other means.

### User-Attribution

l.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating

33

1   document is found on the computer but attribution is an issue, other documents or files created

2   around that same time may provide circumstantial evidence of the identity of the user that

3   created the incriminating document.

4   **V**

5   **REQUEST TO SEAL AFFIDAVIT**

6       100. Because this is an ongoing investigation, your affiant requests this search warrant

7   affidavit be sealed until such time as the Court orders otherwise. Disclosure of the search

8   warrant affidavit at this time would seriously jeopardize the ongoing investigation, as such

9   disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or

10   allow flight from prosecution.

11   **VI**

12   **CONCLUSION**

13       101. Based upon my training and experience, I am aware that tax preparers use and

14   maintain records, documents, and files (written, printed, magnetic, and electronic) that are

15   evidence of criminal acts and reflect the receipt and disposition of illegally obtained proceeds

16   of income.

17       102. Based upon my training and experience, I am aware that the principals involved

18   in this type of illegal financial fraud often use aliases, fictitious names, or false identification

19   cards to avoid detection. I am also aware that these individuals very often place assets in names

20   other than their own (or in limited liability corporations, partnerships, or other legal entities) to

21   avoid detection of these assets by law enforcement agencies. I am further aware that even

22   though these assets may repose in other persons' (or entities) names, these individuals act as the

23   beneficiaries, continue to use these assets, and exercise dominion and control over them.

24       103. Based upon my training and experience, I am aware that tax preparers involved in

25   illegal financial frauds can amass large proceeds from these activities, and that these individuals

26   often attempt to legitimize these proceeds. I know that to accomplish these goals, these

27   individuals often utilize a number of vehicles and mechanisms, including but not limited to:

28   //

34

SW-000095

foreign and domestic banks and their attendant services, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

104. Based upon my training and experience, I am aware that individuals involved in money laundering activities and other illegal financial frauds at times attempt to conceal substantial wealth from law enforcement authorities, and in particular the IRS, if they have acquired such wealth from illegal activities or are attempting to evade the proper tax liability resulting from such wealth.

105. Based upon my training and experience, I am aware that unexplained wealth is probative evidence of crimes motivated by greed, including but not limited to: money laundering, mail fraud, wire fraud, tax fraud, tax evasion, and aggravated identity theft.

106. Based upon my training and experience, I am aware that it is customary for self-employed tax preparers to retain financial records at various offices and warehouses. Such records can be stored in electronic or hardcopy form, including but not limited to: computer printouts, computer disks, zip disks, hard drives, flash/thumb drives, and other memory storage media.[1] Such records also include audio recordings, telephone answering machine recording,

---

[1] Based on my experience and training, and discussions with other federal agents, I know that to properly retrieve and analyze all electronically stored (computer) data, and to insure accuracy and completeness of such data and to prevent the loss of the data either from accidental or programmed destruction, requires both on-site and laboratory analysis by a qualified computer specialist. To effect such accuracy and completeness requires the seizure of all computer equipment and peripherals, the software to operate them, and related instruction manuals. It should also be noted that the software with the computer is almost always used to create the evidence and without manuals it may be difficult if not impossible to retrieve the data.

According to IRS Special Agent David White, searches and seizures of evidence from computers typically require an examination by a qualified computer expert in a laboratory or controlled environment. This is almost always true because computer storage devices (like floppy disks, hard diskettes, tapes, CD-ROMs, DVDs, flash medium and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included

SW-000096

1  memoranda, correspondence, diaries, notes, address books, day planners, calendars,
2  appointment books, newspaper clippings, articles, books, financial institution records, checks,
3  cashiers' checks, money orders, wire transfer records, deposit slips, ATM receipts, certificates
4  of deposit, safety deposit slips, withdrawal slips, monthly and quarterly statements, stock
5  certificates, bonds, bearer instruments, notes, money market account statements, negotiable
6  orders of withdrawal, account documents, letters of credit, passbooks, drafts, title documents,
7  mortgage and loan documents, property records, storage agreements and bills, storage locker
8  keys, vehicle registration and ownership documents, asset ownership records, journals, ledgers,
9  code sheets, financials, budgets, proposals, plans, contracts, agreements, bills of sale, delivery
10 records, invoices, receipts, documentation of conveyances, deeds, and credit card bills and
11 other papers. These records may be in many forms such as paper, electronic, or in code. I
12 know from my experience that tax preparers use software, such as Quicken, to manage financial
13 records and investments, and use software, such as Lacerte, to prepare tax returns.

---

15 in the warrant. This sorting process can take weeks or months, depending on the volume of
16 data stored, and it would be impractical to attempt this kind of data search on site.

17      In addition, searching computer systems for criminal evidence is a highly technical
18 process requiring expert skill and a properly controlled environment. The vast array of
   computer hardware and software available requires even computer experts to specialize in some
19 systems and applications, so it is difficult to know before a search which expert should analyze
20 the system and its data. The search of a computer system is an exacting scientific procedure
   which is designed to protect the integrity of the evidence and to recover even "hidden", erased,
21 compressed, password-protected, or encrypted files. Since computer evidence is extremely
22 vulnerable to tampering or destruction (both from external sources or from destructive code
   imbedded in the system as a "booby trap"), the controlled environment of a laboratory is
23 essential to its complete and accurate analysis.

24      In order to fully retrieve data from a computer system, the analyst needs all magnetic
25 storage devices as well as the Central Processing Unit (CPU). In addition, the analyst needs all
   the system software (operating systems or interfaces, and hardware drivers) and any
26 applications software which may have been used to create the data (whether stored on hard
27 drives or on external media). A member of the IRS's Computer Team will accompany the
   searching agents and, if possible, make an image of some or all of the computerized data
28 storage devices will be done on-site to minimize the number of devices seized from the
   business.

36

SW-000097

107.   Based upon my training and experience, I am aware that persons who own real estate often keep records of such purchases at their residences and their offices.  These records include escrow, title, loan files, and deeds of trust, grant deeds, quitclaim deeds, reconveyance deeds, release deeds, mortgage records, and other documentation supporting conveyance and/or ownership of the properties.  I know that persons who own real estate typically insure their property and possessions contained therein.  I know those records include replacement value estimates, appraisals, and photographs of the properties and possessions.  In addition, I know that persons that own real estate often make home improvements and additions to the properties, and typically, keep records of such improvements at their residences or their offices.

108.   Based on my training and experience, I am aware that owners, managers, and operators of small businesses keep records at their business locations.  These records include various accounting journals (e.g., sales, purchases, sales returns and allowances, adjusting journals) and business ledgers (e.g., trial balances, cash, accounts receivable, equipment, accounts payable and accrued expenses, payroll, and other subsidiary ledgers).  In addition, I know that tax preparers who own and operate their own businesses frequently maintain a variety of records to manage their client records, cash, payroll, equipment, and tax situation.  Similarly, they must also maintain various financial records such as bank statements, cancelled checks, invoices, sales receipts, and credit card statements in order to conduct their normal business activities.

109.   Based upon my training and experience, I know that tax preparers who use laptop computers, disks, zip drives, external hard drives, flash/thumb drives, and other computer storage devices often transport such items between work and home so that they are accessible at any time.

110.   Based upon my training and experience, I know that tax preparers who have engaged in financial fraud typically maintain books, records, receipts, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets, and the obtaining, secreting, transfer, concealment, and/or expenditure of money.  Similarly, I know that tax preparers who have engaged in financial fraud often maintain records relating to their off-shore

37

1    banking activity (if they do, in fact, have such accounts).  In addition, I know that they typically

2    maintain addresses, appointment and/or telephone books and/or papers reflecting names,

3    addresses, telephone numbers and their meeting times.

4       111.   Based upon my training and experience, discussions with other federal agents and

5    witnesses, and the above listed facts, I believe probable cause exists that STEVEN MARTINEZ

6    is maintaining records involving his tax preparation business (including but not limited to

7    individual and entity tax returns, individual and entity financial records, evidence of estimated

8    tax payments, bank records, and credit card records).

9       112.   IRS Revenue Agent Douglas Sanderson has informed me that he has worked as a

10   Revenue Agent for 20 years.  In this capacity, he has audited hundreds of tax returns and had

11   extensive dealings with tax preparers.  Based on his experience and training, Agent Sanderson

12   stated that a tax preparer, such as STEVEN MARTINEZ, would maintain a large number of

13   books and records and tax returns in order to conduct his business activity and track his

14   finances for tax purposes.

15      113.   According to Agent Sanderson, these books and records and tax returns would

16   include: income tax returns (including Forms 1040, 1040A, 1040-EZ, 1040X, 1120, 1120S,

17   1065, 940, 941, DE-3); income tax information documents (including Forms 1099, W-2, W-4,

18   K-1), supporting work papers, summary sheets, and analyses; documents relating to any audits;

19   accounting journals (including general journals, cash receipts journals, cash disbursement

20   journals, sales journals, purchase journals, and payroll journals); general and subsidiary ledgers

21   (including payroll, accounts receivable, equipment, investments, accounts payable and accrued

22   expenses, sales, and purchases); charts of accounts, adjusting and closing entries, year-end trial

23   balances, entity minutes, bylaws, and entity formation documents; employee lists and employee

24   contracts; documents showing the receipt or disbursements of cash (including records of

25   royalties, credit card statements and receipts, invoices, records of commercial storage, cash

26   reconciliations, and records regarding any purchase or sale of assets); loan documents to or

27   from shareholders and related entities with payment history; other loan documents; inventory

28   records; financial statements; contracts (including contract bids and proposals); mortgage

SW-000099

1    records or other documentation supporting conveyances and/or ownership of property;
2    documents and records relating to other corporations, limited liability companies, partnerships
3    and other entities which have related ownership.

4        114.   According to IRS Agent Sanderson, a self-employed tax preparer/CPA, such as
5    STEVEN MARTINEZ, would typically maintain a large volume of records related to his tax
6    return preparation and accounting business and his personal banking activity.   Documents
7    related to the tax preparation and accounting business include, but are not limited to: income
8    tax information documents and tax returns, accounting journals, general and subsidiary ledgers,
9    cash receipts and disbursements journals, charts of accounts, adjusting and closing entries,
10   year-end trial balances, financial statements,  bank account statements, check ledgers, bank
11   reconciliations, entity minutes, employee lists and employee contracts, client lists, loan
12   documents and receipts and/or invoices for items purchased.   Personal banking activity
13   documents include, but are not limited to: bank statements, check registers, passbooks, deposit
14   and withdrawal slips, cancelled checks, certificates of deposit, notes, wire transfers, account
15   applications, negotiable instruments, safety deposit box records and keys; money drafts, letters
16   of credit, money orders, cashiers' checks and receipts for same, bank issued checks, and bank
17   reconciliations.

18       115.   Based on the facts above, my training and experience, and a review of the
19   documents and other relevant information that I believe to be reliable, I submit there is probable
20   cause to believe that STEVEN MARTINEZ is participating in and has participated in a
21   fraudulent scheme to defraud his clients, the IRS, and the FTB out of millions of dollars in
22   estimated taxes due and owing to the federal and state governments.

23       116.   Based on the facts above, my training and experience, and a review of the
24   documents and other relevant information that I believe is reliable, I submit there is probable
25   cause to believe that evidence, fruits and instrumentalities of violations of federal law,
26   including filing false tax returns, in violation of 26 U.S.C. § 7206; tax evasion, in violation of
27   26 U.S.C. § 7201; filing false claims with the United States, in violation of 18 U.S.C. § 287;
28   mail fraud, in violation of in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18

SW-000100

1  U.S.C. § 1343; money laundering, in violation of 18 U.S.C. § 1956 and § 1957; and aggravated

2  identity theft in violation of 18 U.S.C. § 1028A; as set forth in **Attachment B**, will be found at

3  the locations described in **Attachment A-1** and **Attachment A-2**.

4      117.  In consideration of the foregoing, I respectfully request that this Court issue a

5  search warrant for the locations described in **Attachment A-1** and **Attachment A-2** for the

6  items fully described in **Attachment B**.

7

8  Dated this 2⅛ day of March, 2011

9

10                                       Anthony Lysek

11                                       Senior Special Agent

                                     U.S. Internal Revenue Service

12

13  Subscribed and sworn to before me

14  This 2⅛ day of March, 2011, at San Diego, California.

15

16

17  HONORABLE WILLIAM MCCURINE, JR.

18  United States Magistrate Judge

19  Southern District of California

20

21

22

23

24

25

26

27

28

SW-000101

# Exhibit 2

 

AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Steven Martinez, CPA, Accountancy Corp.<br>5830 Oberlin Drive, Suite 300<br>San Diego, California 92121 | )<br>)<br>)<br>)<br>)<br>) |

Case No.

'11 ▓▓0729

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Southern_____ District of _____California_____ *(identify the person or describe property to be searched and give its location)*:

See Attachment A-2 (incorporated herein)

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___26___ U.S.C. § __7206, 7201__ , and the application is based on these facts:

See Affidavit (incorporated herein); the search is also related to violations of 18 U.S.C. 1341 (mail fraud), 1343 (wire fraud), 1956 and 1957 (money laundering, and 1028A (aggravated identity theft).

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ANTHONY LYSEK, Special Agent with IRS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/2/11 _____

_____
*Judge's signature*

City and state:  San Diego, California _____

WILLIAM MCCURINE, Jr., United States Magistrate Judge
*Printed name and title*

SW-000003

AO 93  (Rev. 01/09) Search and Seizure Warrant



# UNITED STATES DISTRICT COURT

### for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Steven Martinez, CPA, Accountancy Corp.<br>5830 Oberlin Drive, Suite 300<br>San Diego, California 92121 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

'11 **0729**

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2 (incorporated herein)

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 17, 2011_____
(not to exceed 10 days)

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge _WILLIAM MCCURINE, Jr._____ .
(name)

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐for _____ days *(not to exceed 30)*.
☐until, the facts justifying, the later specific date of _____

Date and time issued: _3/2/11 , 1401m____        _____
Judge's signature

City and state:  San Diego, California _____        ___WILLIAM MCCURINE, Jr., United States Magistrate Judge___
Printed name and title

SW-000001

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: <br> '11 0729 | Date and time warrant executed: <br> 3/3/11      11:20 A.M. | Copy of warrant and inventory left with: <br> KENNETH NOORIGIAN |
| Inventory made in the presence of : <br> JIM DENNISON | | |
| Inventory of the property taken and name of any person(s) seized: | | |

SEE INVENTORY LISTING OF ALL ITEMS SEIZED
AT 5830 OBERLIN DR., SUITE 300, SAN DIEGO ATTACHED.

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  3/16/11

_____
Executing officer's signature

ANTHONY LYPEK     SPECIAL AGENT
_____
Printed name and title

SW-000002



## ATTACHMENT A-2

## DESCRIPTION OF PREMISED TO BE SEARCHED

*Business of Steven Martinez, 5830 Oberlin Drive, Suite 300, San Diego, California 92121, County of San Diego (the Target Business)*

1.  The business of Steven Martinez, currently known as Steven Martinez, CPA, An Accountancy Corporation, is located in a three-story, cream colored stucco building. The building is located on the west side of Oberlin Drive and is south of Mira Mesa Boulevard. There is an overhang from the main structure over the driveway entrance to the building bearing the street address number "5830" in large black numbers. On the lower right column at the driveway entrance to the building is the name "Oberlin Park" in white letters. Steven Martinez, CPA, An Accountancy Corporation is at Suite 300, located on the third floor of the building. Printed on the front glass door of the office is the name "Steven Martinez, CPA, An Accountancy Corporation." Steven Martinez shares the office suite with his former partner, Kenneth Goertz, CPA whose name is also printed on the glass door. Inside the office suite, Steven Martinez and Kenneth Goertz have their own separate offices and filing cabinets. A third name, Kenneth C. Noorigian Esq., is also printed on the front glass door. There is a reception area upon entry through the glass door. Steven Martinez's office is located on the left side of the hallway leading from the reception area. Adjacent to Steven Martinez's office is a conference room and outdoor patio. Kenneth Goertz's office is to the right of the hallway leading from the reception area. Adjacent to Ken Goertz's office is a kitchen area which may contain a file cabinet with documents belonging to Steven Martinez.




SW-000004



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence of fraud, money laundering, filing false tax returns, tax evasion, filing false claims with the United States, and aggravated identity theft relating to the following persons and entities:

STEVEN MARTINEZ
STEVEN MARTINEZ, CPA, AN ACCOUNTANCY CORPORATION
GOERTZ & MARTINEZ
GOERT-MARTINEZ
EFTPS-2007 INC.
EFTPS-2008 INC
VIA BRAZIL, INC.
AAA FINANCIAL SERVICES
AABS INC.
ACCURATE UNDERGROUND & GRADING INC.
ALKI CAPITAL MANAGEMENT
ALL WATER TEK INC.
AMERICAN CORPORATE REGISTER
ANGUS TOBIASON
ANN CAPOZZA
ANTHONY CAPOZZA
ARTHUR TOBIASON
ATLAS TICKETS
BLUE SUN MARKETING INC.
CAPSTONE GROUP LLC
CAPSTONE INVESTMENTS INC.
CAPSTONE PARTNERS
CATHY ANDREWS
CDAC, INC.
CHICAGO TITLE
CHRIS PARSONS
CONCRETE CREATIONS INC.
CYNTHIA MARTINEZ
DAN MUSETTI & Co.
DAVID KUPFER
DAVID ROGERS
DENNIS HOTTENSTEIN

SW-000005

DIANE SMITH
DONALD MARTINS ELECTRICAL
ELITE SURGICAL CENTERS, DEL MAR L.P.
ENVIROSCAPES
ERNEST GARCIA
ERNIE GARCIA
ESTRADA LANDSCAPING
EXPRESS AIR CHARTER
FIRST HAWAII FINANCIAL, INC.
GLENN ABADIR
HALLMARK ESCROW
HARMON CONTRACTING COMPANY
JOE LIBERTY
JOHN V. SMITH
JONATHAN D. SMITH
KENNETH NOORIGIAN
LEVEL ONE MARKETING
LORETTA ABADIR
MANUFACTURED STRUCTURES INTERNATIONAL
MSI
MARIANNE HARMON
MEENA SMITH
MIDWEST SUPPLY CENTER INC.
MONIQUE SIEGEL
MSI PLANT OPERATIONS
NEW AGE GLOBAL INC.
NEW AGE INTERNATIONAL INC.
NIP & TUCK LLC
OUTPATIENT SURGERY OF DEL MAR LLC
PACIFIC PLAYGROUNDS
PEDRO DANIEL FERRETTI
PERRY ABADIR
PHILIP HERR
POINT LOMA SURGICAL CENTER
SANDPIPER DATA SYSTEMS INC.
SANDPIPER WORLDWIDE INC.
SCOTT WILFONG
SKYLAR-HALEY LP
STEPHEN HARMON

SW-000006

STEVEN CAPOZZA
SURGICAL VENTURES INC.
THRESHOLD AIR CHARTER
TOBIASON BROTHERS
WEIS ELECTRIC INC.
W.F.E. LTD.
2011 HOLDINGS INC.

and any name variations of such individuals and entities for the period from January 1, 2004 through the present, unless other noted, limited to:

a.  **Tax Returns and Publications** – For tax years 2004 through 2008, all Federal and State of California tax returns (including all related schedules, forms, worksheets, and attachments for all tax returns for individuals, corporations, partnerships, S-corporations, trusts, and estates), employment tax returns, information returns, tax documents and publications. These documents include but are not limited to:

    i.  U.S. Individual Income Tax Returns (Forms 1040, 1040A, 1040EZ, and 1040X) and Related Schedules (Schedule A, B, C, D, E, and K-1);

    ii.  U.S. Corporation Income Tax Returns (Forms 1120 and 1120-S);

    iii.  Forms W-2 and W-4

    iv.  State of California Income Tax Returns (Forms 540, 540A, 540EZ, and 540NR);

    v.  State of California Corporation Franchise or Income Tax Return (Forms 100 and 100S); and

    vi.  IRS Publications, IRS tax code, California Franchise Tax Board Publications, California tax code, and material from tax related seminars or courses.

b.  **Tax Documents** – All documents and records related to the preparation of client tax returns for tax years 2004 through 2008, including but not limited to receipts and documentation for deductions, entity business records and receipts for expenditures, client questionnaires, client worksheets, and client interview/call notes and memoranda.

SW-000007

c.      **Tax Payments by Clients** – All documents and records related to the payment by clients for federal and state estimated taxes and taxes due and owing, including but not limited to copies of checks received from clients.

d.      **Customer Lists and Client Information** – Customer lists and client information including all client files, appointment books, address books, diaries, planners, Rolodexes, interviewing sheets, or any documents and records related to interviews with clients.

e.      **Client Records for Payment of Services** – All documents and records including but not limited to receipts, receipt books, journals, ledgers, and bills showing charges to clients and payment from clients for tax and accounting services rendered by STEVEN MARTINEZ for tax years 2004 through 2008.

f.      **Accounting and Financial Records** – All accounting records including all income statements, balance sheets, general ledgers, subsidiary ledgers, trial balances, ledgers of cash disbursements, accounts payable, accounts receivable, Quicken or Quickbooks records, all tax related information, Lacerte records, and all other spreadsheets, summaries, and compilations of accounting and financial information.

g.      **Bank and Financial Statement Records** – All statements and records for bank or financial accounts at domestic or foreign banks, savings and loans, credit unions, securities brokers, or other financial institutions under any name. The records include all cancelled checks, check registers, deposit slips, confirmation slips, signature cards, bank cards, credit cards, and any documents related to the origin of all deposited items for all deposits, debit and credit memos, and documents related to wire transfers.

h.      **Loan Documents** – Promissory notes, loan agreements, amortization or repayment schedules, mortgages, and any documents related to collateral or security repayments for all loans.

i.      **Documents Related to Dominion and Control or Involvement** – Documents and articles of personal property evidencing identity of persons with dominion and control or those occupying, possessing, owning, frequenting, or involved in the premises to be searched. These documents include rental agreements, lease records, property acquisition records, mortgage statements, real estate tax records, utility and telephone bills and receipts, Internet bills, keys, mail envelopes, certified mail receipts, postage stamp meters, stamps containing address and personal information, stamps containing the address of the Internal Revenue Service, storage records, correspondence, mail service carrier records

SW-000008

(including records of offsite mailboxes and post office boxes), and safety deposit records.

j. **Correspondence from the Internal Revenue Service and/or California Franchise Tax Board for the above-listed individuals and/or entities.**

k. **Correspondence between the above-listed individuals and/or entities** – This includes e-mails, letters, facsimiles, and any document indicating a mailing or shipment to STEVEN MARTINEZ and any of his businesses.

l. **Cash** – Cash will be photographed and counted on the premises. Cash will not be seized.

m. **Documents Related to the Receipt and Disbursement of Cash** – This includes credit card statements, receipts, invoices, bills, records of commercial storage, records of personal storage, records of home improvements, records of home construction, records of vehicles, bank reconciliations, bank statements, cash reconciliations, and corresponding records.

n. **Forensic Images of Computers and Computer Data** – This includes any and all forensic images of STEVEN MARTINEZ's computers and computer data, including but not limited to the forensic images taken pursuant to a civil action on behalf of Anthony and Ann Capozza, through their attorneys, Keesal, Young, & Logan, plc., in 2009.

which evidence will tend to prove the commission of (1) Filing False Tax Returns, in violation 26 U.S.C. § 7206, (2) Tax Evasion, in violation of 26 U.S.C. § 7201, (3) Filing False Claims with the United States, in violation of 18 U.S.C. § 287, (4) Mail and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, (5) Money Laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and (6) Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.

As used throughout this list of items to be seized, the terms "items," "documents" and "records" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

SW-000009

Authorization is sought to search for and seize evidence of fraud, money laundering, filing false tax returns, tax evasion, and aggravated identity theft relating to the following persons and entities listed above in paragraph 1. Authorization to search includes any detached structures from the primary premises if such additional structures exist. This authorization includes the search of physical documents and includes electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with the "Procedures For Electronically Stored Information" provided in the affidavit submitted in support of this warrant. Items to be seized include the following:

    a.     All computer systems, software, peripherals and data storage devices.

    b.     All documents, including all temporary and permanent electronic files and records, relating to any and all of the items described in paragraph 1 above.

    c.     User-attribution data to include data reflecting who used or controlled the computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed. User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.

SW-000010

**AFFIDAVIT**

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF SAN DIEGO  )

I, Anthony Lysek, Senior Special Agent, United States Internal Revenue Service (hereinafter referred to as "IRS"), being duly sworn, depose and declare the following:

**I**

**INTRODUCTION**

1.     I make this Affidavit in support of an Application for a Search Warrant for the following: (1) the premises located at 15859 Rosemont Lane, Ramona, California 92065, County of San Diego (the Target Residence), the residence of STEVEN MARTINEZ, as more fully described in **Attachment A-1**, and (2) the premises located at 5830 Oberlin Drive, Suite 300, San Diego, California 92121, County of San Diego (the Target Business), the business office of STEVEN MARTINEZ, as more fully described in **Attachment A-2**.

2.     Based on the facts set forth herein, I submit there is probable cause to believe that STEVEN MARTINEZ has committed the following offenses during at least tax years 2004 through 2008: filing false tax returns, in violation of 26 U.S.C. § 7206; tax evasion, in violation of 26 U.S.C. § 7201; filing false claims with the United States, mail fraud, wire fraud, money laundering, and aggravated identity theft associated with the filing of false tax returns, all in violation of 18 U.S.C. §§ 287, 1341, 1343, 1956, 1957, and 1028A, respectively.

3.     Based on the facts set forth herein, I also submit there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses, as more fully described in **Attachment B**, will be found at the Target Residence, as more fully described in **Attachment A-1**, and the Target Business, as more fully described in **Attachment A-2**.

4.     This affidavit is based upon information obtained from several sources, including, but not limited to, cooperating witnesses, a review of IRS databases, a review of federal and State of California income tax return information, information received from other IRS personnel, and knowledge gained from my training and experience. Because this affidavit is

1

1    written and offered for the limited purpose of establishing probable cause for the issuance of

2    search warrants, it does not contain all of the information that the government possesses

3    relative to this investigation.

## II

### TRAINING AND EXPERIENCE

6    5.    I have been employed as a Special Agent with the IRS since 1991.

7    6.    I am presently assigned to a Criminal Investigative group located in San Marcos,

8    California, which is in San Diego County.  During my approximately 19 years as a Special

9    Agent, I have investigated numerous cases, including tax evasion, tax fraud, mail fraud, wire

10   fraud, money laundering, and identity theft.

11   7.    Prior to becoming a Special Agent, I received a Master of Arts degree in Business

12   Administration from San Diego State University.

13   8.    During the last 19 years, I have received specialized training in the investigation

14   and prosecution of criminal and civil tax violations.  I am a graduate of the Federal Law

15   Enforcement Training Center (FLETC) in Glynco, Georgia.  As part of this program, I attended

16   six months of criminal investigating training.  My training courses included but were not

17   limited to criminal law, constitutional law, and enforcement techniques, including but not

18   limited to, undercover operations and search warrants.   This training also encompassed

19   classroom training on the principles of federal taxation of individuals, corporations, and

20   partnerships, including analyzing tax returns, filing requirements, statutes of limitation, gross

21   income, inclusions and exclusions, deductions and losses.

22   9.    From my training and experience, I know that it is an established principle of

23   federal tax law that income is generally taxed to the person or entity who earns, benefits from,

24   and directs the use of, such income.  Moreover, 26 U.S.C. § 61 defines gross income as "all

25   income from whatever source derived," including compensation for services and gross income

26   obtained from a client.

27   10.   From my training and experience, I know that it is an established principle of tax

28   law that a tax return preparer and/or a Certified Public Accountant (CPA) who collects

SW-000012

1  estimated tax payments or tax payments due upon the filing of a tax return on behalf of a client

2  has a duty to remit those tax payments to the federal and state governments (i.e., IRS and

3  California Franchise Tax Board) pursuant to federal and state law.

4      11.    Based on my training and experience, I know that the amount of income reported

5  to the State of California must be consistent with the amount of income reported to the federal

6  government because the State of California requires that a copy of the corresponding federal

7  income tax return be attached to the filed California State tax return. Based on my training and

8  experience, I know that maximum tax rates on personal income assessed by the federal

9  government are more than three times the maximum tax rate assessed by the State of California.

10  I also know that the amount of federal estimated income tax payments and actual federal

11  income tax due upon filing of a federal tax return are usually significantly higher than the

12  estimated and actual tax payments due upon the filing of a California State tax return on the

13  same amount of income.

14      12.    Based on my training and experience, I know that income tax liability can

15  frequently be determined by reviewing and examining various business and financial records,

16  such as general ledgers, subsidiary ledgers, cash receipts journals, cash disbursement journals,

17  payroll journals, bank records, receipts, invoices, worksheets, schedules, forms, calendars, logs,

18  and tax returns. Furthermore, I know that individuals and businesses often keep such records,

19  even if they were not used for the preparation of tax returns. Based on my training and

20  experience, I know that individuals often maintain such records for long periods of time. Such

21  records are used for loans, investments, credit card applications, estate and financial planning.

22      13.    I have participated in the execution of approximately 20 search warrants as an

23  IRS Special Agent. On virtually every occasion, I sought general ledgers, subsidiary ledgers,

24  cash receipts journals, cash disbursement journals, payroll journals, bank records, receipts,

25  invoices, worksheets, schedules, forms, calendars, logs, tax returns, computer discs, and

26  computer-generated data. Based on my training and experience, and my discussions with other

27  highly experienced Special Agents with IRS, such records and computer data are frequently

28  stored and maintained at business locations and other locations, such as residences, home

SW-000013

1    offices, garages, briefcases, filing cabinets, closets, storage units, vehicles, computers and
2    computer storage devices, including but not limited to hard drives (internal and external), disks
3    (i.e., CD-rom, DVD-rom, floppy disks), and flash/thumb drives.

4         14.    Based on my training and experience, I am familiar with schemes commonly
5    employed by tax preparers who file false tax returns and commit tax fraud, tax evasion, mail
6    fraud, wire fraud, money laundering, identity theft, and other fraud-related offenses.  I know
7    that these types of crimes are ongoing in nature and the perpetrators will engage in this activity
8    on a continuing basis.  I know that computers, printers, scanners and related equipment are
9    often used to produce false tax returns, false identification documents, and financial records.  I
10   also know such computer equipment is often used to communicate with victims and co-
11   conspirators regarding the fraudulent activities.  Such computer equipment is a valuable tool to
12   a fraud suspect and will often be kept in the suspect's residence, garage, storage area, or
13   vehicle.

14        15.    My training and experience also indicates that computers used to commit tax fraud,
15   tax evasion, mail fraud, wire fraud, money laundering, identity theft, and other fraud-related
16   crimes, often contain digital information showing the fraudulent activities taking place, even after
17   the suspect has attempted to erase such information.  Special computer programs can be used by
18   trained computer forensic examiners, to recover this information.  By seizing any and all
19   computers and computer data on the premises and conducting a forensic examination on their
20   contents, I expect to find valuable digital evidence, thus linking the suspect to the creation of, or
21   communication regarding the filing of false tax returns with the federal and state government.

22                                          **III**

23                  **STATEMENT OF FACTS AND PROBABLE CAUSE**

24   **A.    Background**

25        16.    According to IRS personnel records, on or about July 5, 1988, STEVEN
26   MARTINEZ joined the IRS and became a Revenue Agent in Oceanside, California.  On or
27   about January 18, 1992, STEVEN MARTINEZ resigned from the IRS to join a public
28   accounting firm.

                                          4

SW-000014

17.  According to California Board of Accountancy, STEVEN MARTINEZ has been a licensed Certified Public Accountant (CPA) in California for over 17 years. According to an employee of STEVEN MARTINEZ, STEVEN MARTINEZ formed a tax preparation business with Kenneth Goertz, in San Diego, California, in 1998. The entity was known as Goertz & Martinez LLP and was originally located at 5755 Oberlin Drive, San Diego, California 92121.

18.  According to an employee of STEVEN MARTINEZ, in or about 2003, STEVEN MARTINEZ established an independent tax preparation business under the name STEVEN MARTINEZ, CPA, An Accountancy Corporation. At this time, Kenneth Goertz also formed an independent tax preparation business. However, STEVEN MARTINEZ and Kenneth Goertz continued to share office space at 5755 Oberlin Drive, San Diego, California 92121.

19.  According to an employee of STEVEN MARTINEZ, in October 2007, STEVEN MARTINEZ and Kenneth Goertz moved their offices from 5755 Oberlin Drive to 5830 Oberlin Drive, Suite 300, San Diego, California 92121. STEVEN MARTINEZ and Kenneth Goertz have separate space located within Suite 300, including separate offices and filing cabinets. According to IRS records, surveillance, and witness statements, STEVEN MARTINEZ presently conducts his tax return business at 5830 Oberlin Drive, Suite 300, San Diego, California 92121.

20.  According to IRS records, business records, and witness statements, for tax years 2003 through 2007, STEVEN MARTINEZ prepared hundreds of federal income tax returns for his clients, including returns for individuals, corporations, and partnerships. STEVEN MARTINEZ also prepared state income tax returns for his clients.

B.  **The Scheme to Defraud Taxpayer-Clients**

21.  Based on the information and records gathered from the investigation, it is my opinion that from at least 2003, STEVEN MARTINEZ engaged in a scheme to defraud both his clients and the IRS. According to IRS records, business records, witness statements and other documents, STEVEN MARTINEZ prepared two sets of tax returns for a group of his clients. STEVEN MARTINEZ provided his clients with the first set of tax returns showing a significant amount of income and tax due. This first set of tax returns also reflected the amount of

SW-000015

1  estimated tax payments made by the client during the tax year and, in some cases, showed an

2  additional tax due as a remittance with the filed tax return.  STEVEN MARTINEZ instructed

3  his clients to make checks payable for estimated federal and state income taxes to one of four

4  entities (GOERTZ & MARTINEZ CTA Inc.; GOERT-MARTINEZ CTA Inc.; EFTPS-2007

5  Inc.; EFTPS-2008 Inc.), none of which were associated with the IRS or the California

6  Franchise Tax Board (FTB).  In contrast, STEVEN MARTINEZ prepared a second set of tax

7  returns showing a greatly reduced amount of income, tax due, and estimated tax payments

8  made by the client.  STEVEN MARTINEZ filed with the IRS this second set of tax returns

9  without the clients' knowledge.  Among other things, it is my belief that STEVEN MARTINEZ

10  diverted the funds he collected from his clients for federal and state taxes he was supposed to

11  remit to the IRS and State of California and used those funds for his own personal use.

12       22.    An employee of STEVEN MARTINEZ stated that STEVEN MARTINEZ

13  utilized the services of Philip Herr to establish more than fifty (50) entities.  According to

14  business records, some of these entities include: 2011 Holdings, Inc., Manufactured Structures

15  International (aka MSI), Nip & Tuck LLC, Via Brazil Inc., and CDAC, Inc.  Many of the

16  entities have the registered address as: 711 South Carson Street, Carson City, Nevada 89701.

17  In executing his scheme to defraud his clients, IRS records show that STEVEN MARTINEZ

18  used this same address, on many of the false federal income tax returns that he filed with the

19  IRS, as the client's home address, when in fact it was not the client's home address.

20       23.    According to Bank of America records, STEVEN MARTINEZ utilized five

21  different nominee bank accounts (including one time deposit account) during the years 2004

22  through 2008 in order to deposit his client's estimated tax payments and other tax due

23  remittances when the tax returns were filed.  Based on an analysis of IRS records and business

24  records, during the period from 2004 through 2008, STEVEN MARTINEZ deposited at least

25  $11 million in payments from nine different clients into one or more of the five nominee bank

26  accounts in the names of one of these five entities: GOERTZ & MARTINEZ CTA, GOERT-

27  MARTINEZ CTA, EFTPS-2007 Inc., EFTPS-2008 Inc., and Via Brazil Inc. It has been

28  established through client interviews, proffers, bank records and other documents that clients of

SW-000016

1  STEVEN MARTINEZ wrote checks payable to these entities for either estimated tax payments
2  or tax payments due upon the filing of federal and California State income tax returns.  Based
3  on the interviews of eight clients, each client stated that they made their checks payable to these
4  entities at the instruction of STEVEN MARTINEZ and with the understanding that STEVEN
5  MARTINEZ would remit the tax payments to the IRS and FTB on their behalf.

6       24.    According to business records and witness interviews, the bank accounts in the
7  name of EFTPS-2007 Inc. and EFTPS-2008 Inc. established at Bank of America were used by
8  STEVEN MARTINEZ to deposit payments from clients of his tax preparation business.  The
9  signature cards on file with Bank of America for the accounts listed Ernest Garcia as the only
10  owner and authorized signer on the accounts.  Mr. Garcia was shown signature cards for the
11  two Bank of America accounts, EFTPS-2007 Inc., and EFTPS-2008 Inc., each bearing his
12  name, address and social security number.  Mr. Garcia was listed as an authorized signer on the
13  accounts and each signature card had what appeared to be the signatures of Mr. Garcia.  Mr.
14  Garcia looked at the signature on the EFTPS-2007 Inc. signature card and said that the
15  signature, "Ernest S. Garcia" was made by him.  Mr. Garcia looked at the signature on the
16  EFTPS-2008 Inc. signature card and said that the signature, "Ernie Garcia" was not signed by
17  him.  Mr. Garcia said he was not aware of any business accounts opened with his name.  Mr.
18  Garcia said that his friend, STEVEN MARTINEZ, had once asked him to sign a document in
19  order to put his name (Ernest Garcia) on a bank account in case anything happened to STEVEN
20  MARTINEZ or his family so that Mr. Garcia would have access to the funds.  Mr. Garcia
21  recalled signing such a document for STEVEN MARTINEZ.  Mr. Garcia said he has known
22  STEVEN MARTINEZ for about 20 years and he did not question him about the bank account.
23  Mr. Garcia is not aware of the name on the bank account and has never seen any bank records
24  related to the bank account.  Mr. Garcia was shown a series of checks which were drawn on the
25  EFTPS-2007 Inc. and EFTPS-2008 Inc. accounts at Bank of America.  Mr. Garcia said he has
26  never seen these checks and that he did not sign the checks nor did he make any deposits to the
27  EFTPS-2007 Inc. or EFTPS-2008 Inc. accounts at Bank of America.
28  //

7

SW-000017

#### (1)     Clients – Anthony and Ann Capozza

25.     According to IRS records, business records, witness interviews, and other documents, STEVEN MARTINEZ prepared federal and California State income tax returns for his clients Anthony Capozza and Ann Capozza for tax years 2004 through 2007.  Mr. and Mrs. Capozza told federal agents that they owned three business entities during this period, which impacted their federal tax returns: Capstone Investments Inc., Capstone Group LLC, and Capstone Partners.

26.     According to the federal tax returns for tax years 2004 through 2007 that STEVEN MARTINEZ prepared and presented to Mr. and Mrs. Capozza, the amount of tax due on those federal tax returns indicated that Mr. and Mrs. Capozza owed federal income taxes of approximately $690,000 in total for tax years 2004 through 2007.  Mr. and Mrs. Capozza stated that STEVEN MARTINEZ would instruct them to write out checks during the year for estimated income taxes and also income tax due when the tax returns were prepared and ready to be filed.  According to business records and witness interviews, during the period from August 2, 2004 to June 12, 2008, Mr. and Mrs. Capozza made checks for federal and state income taxes payable to EFTPS-2007 Inc., EFTPS-2008 Inc., GOERTZ & MARTINEZ CTA and GOERT-MARTINEZ CTA at the direction of STEVEN MARTINEZ, totaling approximately $695,000.  In contrast to the federal tax returns presented to Mr. and Mrs. Capozza, the federal tax returns filed by STEVEN MARTINEZ with the IRS for Mr. and Mrs. Capozza indicated that Mr. and Mrs. Capozza owed only $184,871 in federal income taxes.

27.     An analysis of the five nominee bank accounts indicates that Mr. and Mrs. Capozza's checks for tax payments were deposited into the nominee accounts.   Furthermore, according to IRS records, the total amount of payments that were remitted to Mr. and Mrs. Capozza's IRS account by STEVEN MARTINEZ for tax years 2004 through 2007 was no more than $33,428.  According to FTB records the total amount of payments that were remitted to Capozza's FTB account by STEVEN MARTINEZ for tax years 2004 through 2007 was no more than $19,134. This indicates that at least $642,438 of the $695,000 in tax payments made to STEVEN MARTINEZ was not paid over to the IRS or the FTB.

SW-000018

28.     Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Anthony and Ann Capozza that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

### (2)     Client – Monique Siegel

29.     According to IRS records, business records, witness interviews, and other documents, STEVEN MARTINEZ has prepared federal and California State income tax returns for his client Monique Siegel for more than 10 years, including tax years 2004 through 2007. Ms. Siegel told federal agents that she owns a small apartment complex with approximately 20 rental units from which she generates rental income that is reported on her personal tax returns.

30.     According to IRS records, STEVEN MARTINEZ did not include any of the rental income or activity from the apartment complex on the federal tax returns that STEVEN MARTINEZ filed for Ms. Siegel for tax years 2004 through 2006.  For tax year 2007, STEVEN MARTINEZ did not file a federal tax return for Ms. Siegel.  However, Ms. Siegel stated that STEVEN MARTINEZ presented a 2007 federal income tax return to her, which she believed STEVEN MARTINEZ had filed on her behalf.  Ms. Siegel said that she discovered that STEVEN MARTINEZ had not filed a federal tax return for tax year 2007 only after she hired a new CPA who attempted to amend her tax return for 2007.

31.     According to the federal tax returns for tax years 2004 through 2007 that STEVEN MARTINEZ prepared and presented to Ms. Siegel, the amount of income and tax due on those federal tax returns indicated that Ms. Siegel owed taxes of approximately $200,000 over the four-year period.  According to business records and witness interviews, during the period from April 12, 2004 to April 10, 2007, Ms. Siegel made checks for federal income taxes payable to EFTPS-2007 Inc. and GOERTZ & MARTINEZ CTA at the direction of STEVEN MARTINEZ, totaling $162,296. In contrast to the federal tax returns presented to Ms. Siegel, the federal tax returns filed by STEVEN MARTINEZ with the IRS for Ms. Siegel indicated that she owed approximately $4,000 in taxes over the four-year period.  Furthermore, according to IRS records, the total amount of payments that were remitted to Ms. Siegel's IRS account by

9

SW-000019

STEVEN MARTINEZ for tax years 2004 through 2007 totaled approximately $3,528, as of December 2008. In late 2008, Ms. Siegel discovered that STEVEN MARTINEZ had filed false tax returns in her name and that her tax payments had not been remitted to the IRS for the last four years. After Ms. Siegel confronted STEVEN MARTINEZ with the knowledge he had had not remitted her tax payments to the IRS, STEVEN MARTINEZ thereafter made one additional federal tax payment to Ms. Siegel's IRS account for tax year 2007 on December 28, 2008 in the amount of $74,000. Similarly, STEVEN MARTINEZ made payments totaling approximately $23,998 on December 15, 2008 to the FTB for Ms. Siegel's 2005 and 2006 California income tax due, which was more than a year after Ms. Siegel had given her tax payments to STEVEN MARTINEZ to remit to the FTB.

32.    An analysis of the five nominee bank accounts indicates that Ms. Siegel's checks for tax payments were deposited into the nominee accounts. According to IRS records, the total amount payments that were remitted to Ms. Siegel's IRS account by STEVEN MARTINEZ for tax years 2004 through 2007 was approximately $77,528. According to FTB records the total amount of payments that were remitted to Ms. Siegel's FTB account for tax years 2004 through 2007 was approximately $40,810. This indicates that even after STEVEN MARTINEZ was confronted by Ms. Siegel, STEVEN MARTINEZ still failed to pay over to the IRS and FTB at least $43,958 of the $162,296 in tax payments that Ms. Siegel had made to STEVEN MARTINEZ.

33.    Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Monique Siegel that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

### (3)    Clients – John and Meena Smith

34.    According to IRS records, business records, witness interviews, and other documents, STEVEN MARTINEZ prepared federal and California State income tax returns for his clients John V. Smith and Meena Smith for tax years 2004 and 2006. Mr. and Mrs. Smith stated that STEVEN MARTINEZ would instruct them to write out checks during the tax year

SW-000020

1   for estimated income taxes and also income tax due when the tax returns were prepared and

2   ready to be filed.

3       35.    According to business records and witness interviews, Mr. and Mrs. Smith made

4   checks for federal and state income taxes payable to EFTPS-2007 Inc. and GOERTZ &

5   MARTINEZ CTA Inc. at the direction of STEVEN MARTINEZ, for the 2004 and 2006 tax

6   years totaling approximately $1,626,093. In contrast to the federal tax returns presented to Mr.

7   and Mrs. Smith, the 2004 and 2006 federal tax returns filed by STEVEN MARTINEZ with the

8   IRS for Mr. and Mrs. Smith indicated that Mr. and Mrs. Smith owed a total of approximately

9   $45,593 in federal income taxes.

10       36.    An analysis of the five nominee bank accounts indicates that Mr. and Mrs.

11   Smith's checks for tax payments were deposited into the nominee accounts.   According to IRS

12   records, the total amount of payments remitted to Mr. and Mrs. Smith's IRS account by

13   STEVEN MARTINEZ for tax years 2004 and 2006 was no more than $5,494. According to

14   FTB records, the total amount of payments remitted to Mr. and Mrs. Smith's FTB account for

15   tax years 2004 and 2006 was no more than $4,979. This indicates that at least $1,615,620 of

16   the $1,626,093 in tax payments made by Mr. and Mrs. Smith to STEVEN MARTINEZ was not

17   paid over to the IRS or the FTB.

18       37.    Based on an analysis of records obtained during the investigation, there is

19   probable cause to believe that STEVEN MARTINEZ used the majority of funds from John V.

20   Smith and Meena Smith that were deposited into the nominee banks accounts for his own

21   personal use (as summarized in Table A below).

22       *(4)   Clients – Stephen and Marianne Harmon*

23       38.    According to IRS records, business records, and other documents, STEVEN

24   MARTINEZ prepared the tax returns for his clients Stephen Harmon and Marianne Harmon for

25   tax year 2006. According to business records and other documents, Mr. and Mrs. Harmon

26   owned a corporation during this period: Harmon Contracting Company.

27       39.    According to the federal tax return for tax year 2006 that STEVEN MARTINEZ

28   presented to Mr. and Mrs. Harmon, the amount of income reported and tax due on that federal

SW-000021

1 tax return indicated that Mr. and Mrs. Harmon had income of approximately $20,703,874 and

2 owed taxes of approximately $3,389,815.  According to business records, during the period

3 from September 15, 2006 through October 12, 2007, Mr. and Mrs. Harmon made several

4 checks for federal and state income taxes payable to EFTPS-2007 Inc. and GOERT-

5 MARTINEZ CTA Inc., totaling approximately $4,900,000.  Included in these payments was

6 check #6581, which was made payable to EFTPS-2007 Inc. in the amount of $1,332,000.

7 Check #6581 was dated January 11, 2007 and the memo field indicated that the payment was

8 for "IRS Form 1040-ES 2006," which refers to the form used by individual taxpayers to send

9 the IRS estimated tax payments.  In contrast to the federal tax return presented to Mr. and Mrs.

10 Harmon, the 2006 federal tax returns filed by STEVEN MARTINEZ with the IRS for Mr. and

11 Mrs. Harmon indicated that Mr. and Mrs. Harmon had income of approximately $2,131,864

12 and owed taxes of approximately $562,614.

13      40.    An analysis of the five nominee bank accounts indicates that Mr. and Mrs.

14 Harmon's checks for tax payments were deposited into the nominee accounts.  According to

15 IRS records, the total amount of payments remitted to Mr. and Mrs. Harmon's IRS account by

16 STEVEN MARTINEZ for tax year 2006 was approximately $519,000.  According to FTB

17 records the total amount of payments that were remitted to Mr. and Mrs. Harmon's FTB

18 account for tax year 2006 was approximately $181,033.  This indicates that at least $4,199,967

19 of the $4,900,000 in tax payments made to STEVEN MARTINEZ was not paid over to the IRS

20 or the FTB.

21      41.    Based on an analysis of records obtained during the investigation, there is

22 probable cause to believe that STEVEN MARTINEZ used the majority of funds from Stephen

23 and Marianne Harmon that were deposited into the nominee banks accounts for his own

24 personal use (as summarized in Table A below).

25      **(5)    Clients – Glenn and Loretta Abadir**

26      42.    According to IRS records, business records, witness interviews, and other

27 documents, STEVEN MARTINEZ prepared personal and corporate tax returns for his clients

28 Glenn and Loretta Abadir for tax years 2004 through 2007.  Mr. Abadir stated to federal agents

12

SW-000022

1   that he owned two corporations during this period: New Age International Inc. in 2005 and
2   2006, and New Age Global in 2007.   Mr. Abadir also stated that STEVEN MARTINEZ
3   maintains the books and records of his businesses. Mr. Abadir stated that STEVEN
4   MARTINEZ did not provide Mr. and Mrs. Abadir with any copies of the personal or corporate
5   tax returns to keep for their own records.

6       43.   Mr. Abadir stated that STEVEN MARTINEZ instructed him to write out checks
7   during the tax year for estimated income taxes and taxes due when the tax returns were
8   prepared and ready to be filed.  According to business records and statements made by Mr. and
9   Mrs. Abadir, Mr. and Mrs. Abadir made checks for federal and state income taxes payable to
10  EFTPS-20007 Inc., and GOERTZ & MARTINEZ CTA Inc., totaling approximately $426,070,
11  for tax years 2004 through 2007.

12      44.   An analysis of the five nominee bank accounts indicates that Mr. and Mrs.
13  Abadir's checks for tax payments were deposited into the nominee accounts. According to IRS
14  records, the total amount of payments that were remitted to Mr. and Mrs. Abadir's IRS account
15  by STEVEN MARTINEZ for tax years 2004 through 2007 was no more than $468.  According
16  to FTB records, the total amount of payments that were remitted to Mr. and Mrs. Abadir's FTB
17  account by STEVEN MARTINEZ for tax years 2004 through 2007 was no more than $4,877.
18  This indicates that at least $420,725 of the $426,070 in tax payments made by Mr. and Mrs.
19  Abadir to STEVEN MARTINEZ was not paid over to the IRS or the FTB.

20      45.   Based on an analysis of records obtained during the investigation, there is
21  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Glenn
22  and Loretta Abadir that were deposited into the nominee banks accounts for his own personal
23  use (as summarized in Table A below).

24      *(6)*    *Client – Cathy Andrews*

25      46.   According to IRS records, business records, witness interviews, and other
26  documents, STEVEN MARTINEZ prepared personal and corporate tax returns for his client
27  Cathy Andrews for tax years 2005 through 2007. Ms. Andrews told federal agents that she
28  owned a corporation during this period, Sandpiper Data Systems Inc. This corporation's name

SW-000023

1 | was changed by STEVEN MARTINEZ from Sandpiper Data Systems Inc. to Sandpiper

2 | Worldwide Inc. Ms. Andrews also stated that STEVEN MARTINEZ sent tax returns prepared

3 | for her personally and for Sandpiper Data Systems to the IRS and the FTB, but he did not

4 | provide Ms. Andrews with any copies of the tax returns to keep for her own records.

5 |     47.    The personal federal tax returns filed by STEVEN MARTINEZ with the IRS for

6 | Ms. Andrews for tax years 2005 through 2007 indicated that taxes due over the three-year

7 | period totaled approximately $33,000 and were more than satisfied by the approximately

8 | $51,000 of federal payroll taxes withheld from the wages of Ms. Andrews. The personal

9 | federal tax returns filed by STEVEN MARTINEZ with the IRS for Ms. Andrews for the years

10 | 2005 through 2007 also indicated that no tax payments had been made by Ms. Andrews other

11 | than from withheld payroll taxes. The personal income tax returns filed by STEVEN

12 | MARTINEZ for Ms. Andrews indicated a refund was due to Ms. Andrews for each of the tax

13 | years 2005 through 2007. The tax returns filed by STEVEN MARTINEZ indicated that the

14 | refund should be applied to Ms. Andrews' subsequent year's tax liability. In addition, the

15 | federal corporate income tax returns filed by STEVEN MARTINEZ for Sandpiper Data

16 | Systems indicated that Ms. Andrews owed federal corporate income taxes of approximately

17 | $500 for tax years 2005 through 2007, and no estimated federal tax payments were made for

18 | the corporation.

19 |     48.    Despite not owing any significant additional personal or corporate income taxes

20 | for tax years 2005 through 2007, Ms. Andrews stated that STEVEN MARTINEZ instructed her

21 | to write out checks during the tax year for estimated income taxes and taxes due when the tax

22 | returns were prepared and ready to be filed. According to business records and statements from

23 | Ms. Andrews, Ms. Andrews made checks for taxes payable to EFTPS-2007 Inc., EFTPS-2008

24 | Inc., and GOERTZ & MARTINEZ CTA Inc., totaling approximately $417,350, for tax years

25 | 2005 through 2007. Ms. Andrews stated these payments were made for both federal and state

26 | income taxes based upon the instructions that she received from STEVEN MARTINEZ.

27 | //

28 | //

SW-000024

49.     An analysis of the five nominee bank accounts indicates that Ms. Andrews' checks for tax payments were deposited into the nominee accounts.  According to IRS records, no tax payments were remitted to the account of Ms. Andrews for tax years 2005 through 2007. According to FTB records, the total amount of payments that were remitted to Ms. Andrew's FTB account by STEVEN MARTINEZ for tax years 2005 through 2007 was no more than $1,159. This indicates that at least $416,191 of the $417,350 in tax payments made by Ms. Andrews to STEVEN MARTINEZ was not paid over to the IRS or the FTB.

50.     Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Cathy Andrews that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

### (7)     Clients – Jonathan and Diane Smith

51.     According to IRS records, business records, witness interviews, and other documents, STEVEN MARTINEZ prepared personal tax returns for his clients Jonathan D. Smith and Diane Smith for tax years 2004 through 2006.  Mr. Smith told federal agents that he owned a business during the relevant period: Level One Marketing.  Mr. Smith also told federal agents that he was a partner, with Perry Abadir, in a food brokerage called Blue Sun Marketing.

52.     According to business records, during the period from December 22, 2004 through April 27, 2006, Mr. and Mrs. Smith made checks payable to GOERTZ & MARTINEZ CTA and GOERT-MARTINEZ CTA Inc., totaling approximately $328,137.  According to IRS records, the federal tax returns filed by STEVEN MARTINEZ with the IRS indicted that Mr. and Mrs. Smith owed taxes of approximately $34,000 for tax years 2004 through 2006. Approximately $32,000 of the $34,000 in taxes due was paid to the IRS through federal payroll withholding taxes on wages earned by Mr. and Mrs. Smith.

53.     An analysis of the five nominee bank accounts indicates that Mr. and Mrs. Smith's checks for tax payments were deposited into the nominee accounts. According to IRS records, the total amount of payments remitted to Mr. and Mrs. Smith's IRS account by STEVEN MARTINEZ for tax years 2004 through 2006 was no more than $9,973, as of

15

SW-000025

1   December 2008. According to FTB records, the total amount of payments remitted to Mr. and
2   Mrs. Smith's FTB account for tax years 2004 through 2006 was no more than $8,140.

3   54.   In late 2008, Mr. Smith discovered STEVEN MARTINEZ had filed false returns
4   in his name and that his tax payments had not been remitted to the IRS for the years 2004
5   through 2006. After Mr. Smith, through his attorney, demanded repayment, STEVEN
6   MARTINEZ mailed two cashier's checks totaling approximately $499,228 payable to "Internal
7   Revenue Service" to Mr. Smith on or about October 10, 2008 for the tax payments that
8   STEVEN MARTINEZ received from Mr. Smith but had not remitted to the IRS or FTB. The
9   payment also covered some interest and penalties which were incurred as a result of not paying
10  over the money when it was due years earlier. This indicates that prior to STEVEN
11  MARTINEZ being confronted with a demand letter from Mr. Smith's attorney in late 2008, at
12  least $310,024 of the $328,137 in tax payments which were made by Mr. and Mrs. Smith to
13  STEVEN MARTINEZ in 2004 through 2006 had not been paid over to the IRS or the FTB.

14  55.   Based on an analysis of records obtained during the investigation, there is
15  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Jonathan
16  D. and Diane Smith that were deposited into the nominee banks accounts for his own personal
17  use (as summarized in Table A below).

18  *(8)   Client – Dr. David Kupfer*

19  56.   According to IRS records, business records, and other documents, STEVEN
20  MARTINEZ prepared personal tax returns for his client Dr. David Kupfer for tax years 2005
21  through 2007. According to records obtained during the investigation, Dr. Kupfer was a
22  partner and affiliate with the following entities during the relevant period: David Kupfer M.D.
23  APC, Surgical Ventures Inc., Point Loma Surgical Center, Elite Surgical Centers, Del Mar L.P.,
24  and Outpatient Surgery of Del Mar LLC.

25  57.   According to business records, during the period from April 7, 2006 through June
26  6, 2008, Dr. Kupfer made checks payable to GOERTZ & MARTINEZ CTA and GOERT-
27  MARTINEZ CTA Inc., totaling approximately $1,476,064. According to IRS records, the
28  federal tax returns filed by STEVEN MARTINEZ with the IRS for Dr. Kupfer indicated that

SW-000026

1  Dr. Kupfer owed personal federal income taxes of approximately $417,628 over the three-year

2  period.

3      58.    An analysis of the five nominee bank accounts indicates that Dr. Kupfer's checks

4  for tax payments were deposited into the nominee accounts.  According to IRS records, the

5  total amount of payments remitted to Dr. David Kupfer's IRS account by STEVEN

6  MARTINEZ for tax years 2005 through 20007 was no more than $291,959.  According to FTB

7  records, the total amount of payments that were remitted to Dr. David Kupfer's FTB account by

8  STEVEN MARTINEZ for tax years 2005 through 2007 was no more than $61,796.  This

9  indicates that at least $1,122,309 of the $1,476,064 in tax payments made by Dr. Kupfer to

10  STEVEN MARTINEZ was not paid over to the IRS or the FTB.

11      59.    Based on an analysis of records obtained during the investigation, there is

12  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Dr.

13  David Kupfer that were deposited into the nominee banks accounts for his own personal use (as

14  summarized in Table A below).

15      *(9)*    *Client – Steven Capozza*

16      60.    According to IRS records, business records, and other documents, STEVEN

17  MARTINEZ prepared the tax returns for his client Steven Capozza for tax years 2005 through

18  2007.  According to business records, during the period from October 13, 2006 through

19  November 2, 2007, Steven Capozza made checks payable to EFTPS-2007 Inc. and GOERT-

20  MARTINEZ, totaling approximately $191,000.  According to IRS records, the 2005 and 2007

21  federal tax returns filed by STEVEN MARTINEZ with the IRS for Steven Capozza indicated

22  that client Steven Capozza owed approximately $117,000 in federal income taxes.

23      61.    An analysis of the five nominee bank accounts indicates that Steven Capozza's

24  checks for tax payments were deposited into the nominee accounts.  However, STEVEN

25  MARTINEZ did not write any checks from those accounts to either the IRS or FTB on behalf

26  of Steven Capozza.  Furthermore, according to IRS records, at least $25,000 paid by Steven

27  Capozza to STEVEN MARTINEZ for taxes and deposited into the nominee bank accounts was

28  not paid to the IRS.

SW-000027

62.    Based on an analysis of records obtained during the investigation, there is probable cause to believe that STEVEN MARTINEZ used the majority of funds from Steven Capozza that were deposited into the nominee banks accounts for his own personal use (as summarized in Table A below).

*(10)    Clients – Angus and Arthur Tobiason*

63.    According to IRS records, business records, and other documents, STEVEN MARTINEZ prepared personal tax returns for his clients Angus G. Tobiason and Arthur W. Tobiason for tax year 2007.  STEVEN MARTINEZ also prepared a partnership tax return for the brothers' partnership, Tobiason Brothers.

64.    The partnership tax return for Tobiason Brothers, which STEVEN MARTINEZ prepared and filed with the IRS, indicated no income from the business other than a capital gain of $18,389, which resulted from the sale of vacant land that was acquired for approximately $1,741,611 on April 2, 2007 and was sold about three months later on July 6, 2007 for $1,760,000.  However, according to the San Diego County property records, the land that was sold by the Tobiason Brothers on July 6, 2007 for $1,760,000 was but not acquired on April 2, 2007, but rather was acquired by the Tobiason Brothers on or about March 19, 1999, when a deed to the land was recorded with San Diego County.  Moreover, the San Diego County property records also indicate the price at which the Tobiason Brothers acquired the land was approximately $690,000, and not $1,741,611 as indicated on the tax return filed by STEVEN MARTINEZ.  There is no record with the San Diego County Recorder indicating that the Tobiason Brothers acquired this land for $1,741,611 on April 2, 2007.  Among other things, there is probable cause to believe that the tax return prepared by STEVEN MARTINEZ understated the capital gain by $1,051,611, which resulted in a tax loss to the IRS in the amount of $157,742 (assuming a 15% tax rate on capital gains in 2007).

65.    According to business records, during the period from August 23, 2007 through December 28, 2007, checks were made from a Tobiason Brothers' bank account to EFTPS-2007, totaling approximately $408,000.  In contrast to the filed 2007 federal tax returns, according to IRS records, the 2007 federal personal income tax return that STEVEN

18

1   MARTINEZ prepared and filed with the IRS for Angus and Sally Tobiason indicated that they

2   had approximately $12,800 of total income and zero taxable income.   The 2007 federal

3   personal income tax return that STEVEN MARTINEZ prepared and filed with the IRS for

4   Arthur and Sandra Tobiason also indicated that they had approximately $12,800 in total income

5   and zero taxable income.

6          66.    An analysis of the five nominee bank accounts indicates that Angus and Arthur

7   Tobiason's checks for payments were deposited into the nominee accounts.   However,

8   STEVEN MARTINEZ did not write any checks from those accounts to either the IRS or FTB

9   on behalf of Angus or Arthur Tobiason.   Despite receiving an alleged loan document from

10   Angus and Arthur Tobiason, which claims that Angus and Arthur Tobiason entered into a loan

11   agreement with STEVEN MARTINEZ for a total of approximately $408,000, it is my belief

12   that at least $157,742 of the approximately $408,000 paid by Angus and Arthur Tobiason to

13   STEVEN MARTINEZ was intended for tax purposes and for no other reason.   Among other

14   things, based on my training and experience, there is probable cause to believe that STEVEN

15   MARTINEZ filed false 2007 tax returns for the Tobiason Brothers' partnership and false 2007

16   individual tax returns for Angus and Arthur Tobiason.

17          67.    Based on an analysis of records obtained during the investigation, there is

18   probable cause to believe that STEVEN MARTINEZ used the majority of funds from Angus

19   and Arthur Tobiason that were deposited into the nominee banks accounts for his own personal

20   use (as summarized in Table A below).

21          *(11)*    *Client – Scott Wilfong*

22          68.    According to IRS records, business records, witness statements, and other

23   documents, STEVEN MARTINEZ prepared a federal personal tax return for his client Scott

24   Wilfong for tax year 2007.   Scott Wilfong told federal agents that he owns a corporation Alki

25   Capital Management LLC.

26          69.    According to business records, Mr. Wilfong made a check on an Alki Capital

27   Management account payable to "EFTPS 2008" on April 30, 2008 in the amount of $75,211.

28   According to IRS records, Mr. Wilfong's payment history with the IRS indicated that only one

SW-000029

1  estimated tax payment of $100,000 was made to the IRS for the tax year 2007, which Mr.
2  Wilfong stated he made directly payable to the IRS.

3      70. An analysis of the five nominee bank accounts indicates that Mr. Wilfong's
4  $75,211 check for tax payments was deposited into the nominee accounts. Furthermore,
5  according to IRS records, the payment of $75,211 made by Mr. Wilfong to STEVEN
6  MARTINEZ for taxes and deposited into the nominee bank accounts was not paid to the IRS.

7      71. Based on an analysis of records obtained during the investigation, there is
8  probable cause to believe that STEVEN MARTINEZ used the majority of funds from Scott
9  Wilfong that were deposited into the nominee banks accounts for his own personal use (as
10 summarized in Table A below).

11     *(12)   Client – Perry Abadir*

12     72. According to IRS records, business records, witness statements, and other
13 documents, STEVEN MARTINEZ prepared federal personal, partnership, and corporate tax
14 returns for his client Perry Abadir for tax years 2003 through 2005. According to business
15 records and statements by Perry Abadir to federal agents, Perry Abadir was a partner in Skylar-
16 Haley LP and owned the corporation Blue Sun Marketing Inc. for which STEVEN
17 MARTINEZ prepared federal tax returns during this period.

18     73. Perry Abadir told federal agents that STEVEN MARTINEZ maintained the books
19 and records for his businesses and maintained all copies of personal, partnership, and corporate
20 tax returns. Federal agents showed Perry Abadir copies of his 2003 and 2005 individual federal
21 tax returns, and Perry Abadir told federal agents that the signatures on the tax returns were not
22 made by him. Perry Abadir was also shown a copy of the 2003 corporate federal tax return for
23 Blue Sun Marketing Inc.; Perry Abadir told federal agents that the signature on the return was
24 not made by him. According to business records, during the period from June 16, 2004 through
25 October 18, 2005, Perry Abadir made checks payable to bank accounts named "GOERTZ &
26 MARTINEZ" and "GOERT-MARTINEZ," totaling approximately $205,152.

27     74. An analysis of the five nominee bank accounts indicates that Perry Abadir's
28 checks for tax payments were deposited into the nominee accounts. According to IRS records,

20

1   the total amount payments that were remitted to Perry Abadir's IRS account by STEVEN

2   MARTINEZ for tax years 2003 through 2005 was no more than $4,845.  According to FTB

3   records, the total amount of payments that were remitted to Perry Abadir's FTB account by

4   STEVEN MARTINEZ for tax years 2003 through 2005 was no more than $2,802.  This

5   indicates that at least $197,505 of the $205,152 in tax payments made by Perry Abadir to

6   STEVEN MARTINEZ was not paid over to the IRS or the FTB.

7       75.    Based on an analysis of records obtained during the investigation, there is

8   probable cause to believe that STEVEN MARTINEZ used the majority of funds from Perry

9   Abadir that were deposited into the nominee banks accounts for his own personal use (as

10   summarized in Table A below).

11   **C.**   <u>**Disposition of Client Funds**</u>

12       76.    According to business records, during the period from 2004 through 2007,

13   STEVEN  MARTINEZ diverted a majority of the more than $11 million in funds deposited

14   into the five nominee bank accounts (GOERTZ & MARTINEZ CTA, GOERT-MARTINEZ

15   CTA, Via Brazil Inc., EFTPS-2007 Inc., and EFTPS 2008 Inc.), for his own personal use.

16   Occasional transfers occurred between these five nominee bank accounts and other bank

17   accounts controlled by STEVEN MARTINEZ, or other individuals associated with him.

18       77.    **Table A** below lists the specific payee or category of expenditure (Transfers,

19   Cashier's check purchases, and Citibank) for which many of the expenditures were made.

20   Almost all of the payees do not appear to have any connection to the IRS or FTB. The category

21   "Citibank" includes payments to several personal credit cards, and a home equity line of credit

22   from Citibank.  The category "Transfer to Cal Coast Credit Union Acct ending 7249, 2011

23   Holdings Inc." was a single transfer to fund a checking account in the name 2011 Holdings

24   Inc., owned by STEVEN MARTINEZ. Funds from the 2011 Holdings, Inc. account were used

25   for various purposes, including transfers to other bank accounts, personal expenditures, and tax

26   payments to the IRS and FTB.  There were total payments of approximately $637,046 to the

27   IRS and approximately $116,347 to the FTB directly from the 2011 Holdings, Inc. account.

28   The approximately $637,046 in payments made to the IRS included cashier's checks totaling

SW-000031

approximately $499,228, which were made by STEVEN MARTINEZ on behalf of his client, Jonathan Smith, only after Mr. Smith discovered that STEVEN MARTINEZ had not been remitting his tax payments to the IRS, as previously discussed above.  STEVEN MARTINEZ also paid approximately $48,503 to the IRS on behalf of himself and his wife, Cynthia Martinez, from funds in the nominee accounts.

**Table A**

| PAYEE | AMOUNT |
| --- | --- |
| CITIBANK | 2,011,700.33 |
| Transfer to Cal Coast Credit Union Acct 277249 2011 Holdings Inc. | 2,000,000.00 |
| Cashier's Checks Purchased ** | 936,006.10 |
| Chris Parsons | 548,495.00 |
| Hallmark Escrow –Temecula | 514,000.00 |
| Chicago Title | 509,167.09 |
| First Hawaii Financial Inc. | 448,000.00 |
| Nip & Tuck, LLC | 417,111.85 |
| Steven Martinez CPA, AAC | 405,591.00 |
| Manufactures Structures International | 382,000.00 |
| W.F.E. LTD. | 368,341.82 |
| MSI Plant Operations | 355,000.00 |
| Bank of America | 257,305.00 |
| Estrada Landscaping | 243,146.00 |
| Ramona National Bank | 204,010.00 |
| Pedro Daniel Ferritti | 200,131.00 |
| Midwest Supply Center Inc. | 198,000.00 |
| Joe Liberty | 182,584.00 |
| Enviroscapes | 163,301.31 |

SW-000032

| | |
|---|---|
| All Water Tek Inc. | 118,079.00 |
| Ken Noorigian | 112,000.00 |
| California Bank & Trust | 92,055.00 |
| Accurate Underground & Grading Inc. | 88,202.59 |
| Noorigian & Assoc. Client Trust Acct. | 75,000.00 |
| Atlas Tickets | 74,940.00 |
| Dennis Hottenstein | 72,500.00 |
| Concrete Creations Inc. | 69,000.00 |
| Donald Martins Electrical | 68,855.60 |
| Dan Musetti & Co. | 59,200.00 |
| David Rogers | 55,223.00 |
| Cynthia Martinez | 44,400.50 |
| Threshold Air Charter | 36,040.00 |
| AABS INC. | 32,088.38 |
| Weis Electric Inc. | 28,520.05 |
| American Corporate Register | 25,907.46 |
| Express Air Charter | 23,609.00 |
| Pacific Playgrounds | 23,500.00 |
| AAA Financial Services | 16,124.69 |
| Phil Herr | 15,430.00 |
| **TOTAL** | 11,474,565.77 |
| ** Many Cashier's checks were not available, however the cashier's check category includes checks used for personal purchases and also checks made payable to the IRS or FTB on behalf of clients for whom tax returns were prepared. | |

78.    According to an analysis of the IRS records, bank records, and business records, during the period from 2004 through 2007, less than $1 million of the more than $11 million deposited into the five nominee bank accounts was remitted to the IRS or FTB on behalf of the

23

SW-000033

1   clients.  Funds were remitted to the IRS or FTB, via cashier's checks or through transfers to
2   other bank accounts controlled by STEVEN MARTINEZ, rather than being remitted directly
3   from one of the five nominee accounts to which the clients' checks were originally deposited.

4       79.    According to IRS records, STEVEN MARTINEZ filed his own personal and
5   corporate tax returns for tax years 2003 through 2007 reporting income primarily from his CPA
6   practice, known as Steven Martinez CPA, An Accountancy Corporation.  These tax returns
7   were generally filed on time following the year the income was earned.  The gross income
8   originally reported during these years varied in the range of approximately $200,000 to
9   $400,000 per tax year.

10      80.    According to IRS records, between June and July 2009, approximately six
11  months after the criminal investigation into STEVEN MARTINEZ begun and after being
12  confronted by several clients, STEVEN MARTINEZ filed five amended federal income tax
13  returns for tax years 2003 through 2007.  In these amended federal tax returns, STEVEN
14  MARTINEZ reported an increase in adjusted gross income between $2,000,000 and $5,000,000
15  per tax year.  Over the five-year period, the total additional income reported by STEVEN
16  MARTINEZ exceeded $15,000,000, and the total additional tax due exceeded $5,000,000.  The
17  source of income listed on the amended returns was not provided.

18      81.    For example, on STEVEN MARTINEZ's 2006 amended federal income tax
19  return, STEVEN MARTINEZ reported an additional $5,000,000 in "other income" with no
20  explanation as to the source of that income.  However, STEVEN MARTINEZ included a
21  disclaimer in the amended tax return stating:

22          "The taxpayer husband seeks to insure full and absolute compliance with IRC 61
23          and that any assertion to the contrary is not sustained.  Accordingly this amended
            tax return is reporting an addition [sic] $5,000,000 in gross income.  In the future
24          if the Internal Revenue Service or the taxpayer determines this amended tax
25          return overstates the taxpayer's income and a reduction to income is the proper
            course of action, then the Internal Revenue Service will make the necessary
26          adjustment or the taxpayer will file another amended tax return."

27      82.    STEVEN MARTINEZ included similar disclaimers on the other amended federal
28  income tax returns that he filed for tax years 2003, 2004, 2005, and 2007.

SW-000034

**D.     Probable Cause to Search the Target Business**

83.     Based on the information presented in this affidavit, there is probable cause to believe that evidence of STEVEN MARTINEZ's offenses will be located at the Target Business.

84.     According to a photograph of the door of the Target Business, the door contains the following names: (1) "Steven Martinez, CPA, An Accountancy Corporation;" (2) "Kenneth Goertz, CPA, EA, An Accountancy Corporation;" and (3) "Kenneth C. Noorigian, Esq." According a current employee of STEVEN MARTINEZ, the name "Kenneth C. Noorigian, Esq." was placed on the door of the Target Business in 2010.  Also, according to a current employee of STEVEN MARTINEZ, Kenneth C. Noorigian, Esq., does not maintain an office at the Target Business, and merely has his name printed on the door.

85.     Based on my training and experience, and from conversations with other Special Agents of IRS-CI, I know that business records are frequently prepared by the owner (or employees, family members or other associates) at the business location where the business transactions occurred.  Moreover, financial records such as bank statements, deposit slips, checks, check registers, ledgers, and journals are stored, filed, prepared, and maintained at a business location for long periods of time.  I also know that individuals maintain notes and ledgers indicating income received and expenses incurred in the course of their trade or business at their business location.

86.     Based on my training and experience, and from conversations with other Special Agents of IRS-CI, I also know that business owners, more specifically, income tax return preparers, maintain hard copies and/or electronic copies of client records, including copies of their income tax returns, payment records, contact information and correspondence relating to each client, at their business location.

87.     According to an employee of STEVEN MARTINEZ and a review of IRS and business records, STEVEN MARTINEZ uses Lacerte tax preparation software to prepare his clients' tax returns. STEVEN MARTINEZ does not use any employees to input clients' financial information into the program, but inputs the data himself.  STEVEN MARTINEZ

25

1  maintains a computer in the office located at the Target Business, which he uses to prepare

2  client tax returns.  STEVEN MARTINEZ prints the clients' tax returns at his office and mails

3  them to the IRS and State of California for his clients. Therefore, there is probably cause to

4  believe that STEVEN MARTINEZ maintains such tax returns at the Target Business.

5      88.  According to one of STEVEN MARTINEZ's clients, Cathy Andrews, STEVEN

6  MARTINEZ produced to her copies of her tax returns years after the tax returns were originally

7  prepared.  Therefore, there is probable cause to believe that either paper or electronic copies of

8  these tax returns are likely to be maintained at his business.

9      89.  According to an attorney for clients Anthony and Ann Capozza, in mid-2009, a

10  federal judge in the Southern District of California issued a court order that permitted clients

11  Anthony and Ann Capozza, through their attorney, to obtain forensic images of STEVEN

12  MARTINEZ's computers located at the Target Business. The court order was issued in a civil

13  case to allow the clients to search for evidence of false tax returns which were filed by

14  STEVEN MARTINEZ on behalf of the clients.  Mr. and Mrs. Capozza's attorney made

15  forensic images of the computers located at the Target Business in 2009. Subsequent to making

16  these forensic images, Mr. and Mrs. Capozza and STEVEN MARTINEZ reached a civil

17  settlement in or about September 2009 resulting in a financial payment to the clients and a

18  return of the forensic computer images made by the clients to STEVEN MARTINEZ.

19  Therefore, there is probable cause to believe that STEVEN MARTINEZ maintained copies of

20  these forensic images at his Target Business.

21  **E.**   **Probable Cause to Search the Target Residence**

22      90.  Based on the information presented in this affidavit, there is probable cause to

23  believe that evidence of STEVEN MARTINEZ's offenses will be located in the Target

24  Residence. Based on my training and experience, and from conversations with other Special

25  Agents of IRS-CI, I am aware that it is common for self-employed tax preparers to prepare,

26  maintain, or store business and banking records at their residence, and that individuals also

27  often store records relating to their personal income and finances at their residence.

28  //

26

SW-000036

91.     During an interview of an employee that has worked for STEVEN MARTINEZ and Ken Goertz since 1998, the employee told IRS agents that STEVEN MARTINEZ keeps a limited amount of paper files at the Target Business. In fact, when she worked with STEVEN MARTINEZ at the prior business location, 5755 Oberlin Drive, San Diego, California 92121, STEVEN MARTINEZ maintained numerous paper files. In October 2007, when STEVEN MARTINEZ and Ken Goertz moved to the Target Business, the employee stated that she saw several boxes of records that belonged to STEVEN MARTINEZ piled up in the kitchen at the Target Business following the move. However, the employee told IRS agents that, shortly thereafter, those boxes were removed from the kitchen area and she has not seen them stored anywhere at the Target Business. In addition, the employee told IRS agents that she has witnessed STEVEN MARTINEZ enter the Target Business carrying a wheeled-briefcase, which may be used for transporting a laptop computer and office files.

92.     The employee of STEVEN MARTINEZ also told IRS agents that she has been to the Target Residence and she has seen STEVEN MARTINEZ's elaborate home office. The employee said that STEVEN MARTINEZ is often away from the Target Business, even during tax season. The employee recalled that there were instances when STEVEN MARTINEZ's clients came to the business for an appointment, but STEVEN MARTINEZ was not there. The employee would call STEVEN MARTINEZ's cell phone to try and locate him for the appointment.

93.     The employee of STEVEN MARTINEZ told IRS agents that when STEVEN MARTINEZ worked at the prior business location at 5755 Oberlin Drive, San Diego, California 92121, he had his home computer system at the Target Residence connected to the Target Business. According to business records, STEVEN MARTINEZ opened an account with Cox Communications on or about January 2004 for services at the Target Residence. Cox Communications offers cable and high-speed internet services. There is probable cause to believe that STEVEN MARTINEZ currently has services provided by Cox Communications at the Target Residence, as evidenced by a payment for a bill associated with STEVEN MARTINEZ's account on or about February 6, 2011 in the amount of approximately $140.00.

27

SW-000037

1    94.    As discussed above, STEVEN MARTINEZ uses Lacerte tax preparation software

2 to prepare his clients' tax returns.  According to a Lacerte employee, Lacerte software has

3 features available to a user which allows the user to install the software on multiple computers,

4 such as a laptop, and to prepare and print tax returns from multiple locations.  This allows the

5 Lacerte user to prepare tax returns from a location other than a primary business office.

6    95.    Based on my training and experience, and from conversations with Certified

7 Public Accountants (CPA's), I know that during tax season, which is usually the months just

8 prior to and including the month of April in which federal and state tax returns are due, CPA's

9 work long hours and are often working 7 days per week to satisfy the demand for their services

10 to prepare tax returns prior to the April 15th tax return due date. I also know that it is common

11 for CPA's to contact clients from home and do work for clients from home because of the long

12 hours required to prepare clients' tax returns before the tax return due date.  I also know that it

13 is common for CPA's to maintain electronic and paper copies of clients' tax returns that they

14 have prepared in the last two to three years. I know that this requires the storage of large

15 amounts of electronic and paper records, which are normally maintained on computers and in

16 file cabinets and storages boxes for older records.

17    96.    According to an employee at the Target Business, STEVEN MARTINEZ does

18 not store large amounts of paper records at the Target Business.  The employee of STEVEN

19 MARTINEZ also told IRS agents that she has seen large storage containers at the Target

20 Residence.  Therefore, there is probable cause to believe that electronic and paper copies are

21 stored at a secure location where they would be easily accessible to STEVEN MARTINEZ,

22 such as a home office.

23    97.    Based upon the investigation, there is probable cause that STEVEN MARTINEZ

24 currently has a home office at the Target Residence.  On December 5, 2010, CS-1 observed a

25 Hispanic male, approximately 60 years old, accompanied by two young children outside the

26 Target Residence.  At the time, the Hispanic male and two young children were located on the

27 property behind a fence that led to access gates with the letter "M" embossed on them.  Upon

28 being approached by CS-1, the Hispanic male indicated that he worked for the family who lived

28

1   in the Target Residence for approximately 8 years, which made him familiar with the family

2   and the Target Residence. The Hispanic male further stated that the two children with whom

3   he was with were born in the house located on the property. When CS-1 asked whether the

4   owner had an office in the house, the Hispanic male answered in the affirmative saying that,

5   "He's got everything in there." The Hispanic male added that it costs a lot of money to

6   maintain the property, and in fact, the property had its own well located behind the house.

7   When questioned by CS-1 about the type of business that the owner of the house was in, the

8   Hispanic male stated that he could not say very much about that. The Hispanic male did

9   indicate that the owner worked in San Diego, California.

10      98.    Based on my training and experience, it is common for individuals to maintain

11  records for bank accounts and financial records used to maintain illegally obtained funds and

12  the records for the use of such funds in their personal residence where only they have access to

13  such records. Therefore, it is likely that STEVEN MARTINEZ maintains records of bank

14  accounts and financial records at the Target Residence.

15                                      **IV**

16          **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

17      99.    With the approval of the Court in signing this warrant, agents executing this

18  search warrant will employ the following procedures regarding computers and other electronic

19  storage devices, including electronic storage media, that may contain data subject to seizure

20  pursuant to this warrant:

21                              Forensic Imaging

22      a.     After securing the premises, or if sufficient information is available pre-

23  search to make the decision, the executing agents will determine the feasibility of obtaining

24  forensic images of electronic storage devices while onsite. A forensic image is an exact

25  physical copy of the hard drive or other media. A forensic image captures all of the data on the

26  hard drive or other media without the data being viewed and without changing the data in any

27  way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to

28  conducting any search of the data for information subject to seizure pursuant to this warrant.

SW-000039

1    The feasibility decision will be based upon the number of devices, the nature of the devices, the

2    volume of data to be imaged, the need for and availability of computer forensics specialists, the

3    availability of the imaging tools required to suit the number and nature of devices found and the

4    security of the search team.  The preference is to image onsite if it can be done in a reasonable

5    amount of time and without jeopardizing the integrity of the data and the safety of the agents.

6    The number and type of computers and other devices and the number, type and size of hard

7    drives are of critical importance.  It can take several hours to image a single hard drive - the

8    bigger the drive, the longer it takes.  As additional devices and hard drives are added, the length

9    of time that the agents must remain onsite can become dangerous and impractical.

10              b.     If it is not feasible to image the data on-site, computers and other

11   electronic storage devices, including any necessary peripheral devices, will be transported

12   offsite for imaging.  After verified images have been obtained, the owner of the devices will be

13   notified and the original devices returned within forty-five (45) days of seizure absent further

14   application to this Court.

15                    Identification and Extraction of Relevant Data

16              c.     After obtaining a forensic image, the data will be analyzed to identify

17   and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the

18   creation of the forensic image can be a highly technical process requiring specific expertise,

19   equipment and software. There are literally thousands of different hardware items and software

20   programs, and different versions of the same program, that can be commercially purchased,

21   installed and custom-configured on a user's computer system.  Computers are easily customized

22   by their users.  Even apparently identical computers in an office or home environment can be

23   significantly different with respect to configuration, including permissions and access rights,

24   passwords, data storage and security.  It is not unusual for a computer forensic examiner to

25   have to obtain specialized hardware or software, and train with it, in order to view and analyze

26   imaged data.

27              d.     Analyzing the contents of a computer or other electronic storage device,

28   even without significant technical challenges, can be very challenging.  Searching by keywords,

30

SW-000040

1   for example, often yields many thousands of hits, each of which must be reviewed in its context

2   by the examiner to determine whether the data is within the scope of the warrant.   Merely

3   finding a relevant hit does not end the review process.   The computer may have stored

4   information about the data at issue:   who created it, when and how it was created or

5   downloaded or copied, when was it last accessed, when was it last modified, when was it last

6   printed and when it was deleted. Sometimes it is possible to recover an entire document that

7   never was saved to the hard drive if the document was printed.   Moreover, certain file formats

8   do not lend themselves to keyword searches.   Keywords search text.   Many common electronic

9   mail, database and spreadsheet applications do not store data as searchable text.   The data is

10  saved in a proprietary non-text format. Documents printed by the computer, even if the

11  document never was saved to the hard drive, are recoverable by forensic programs but not

12  discoverable by keyword searches because the printed document is stored by the computer as a

13  graphic image and not as text.   Similarly, faxes sent to the computer are stored as graphic

14  images and not as text.   In addition, a particular relevant piece of data does not exist in a

15  vacuum. To determine who created, modified, copied, downloaded, transferred, communicated

16  about, deleted or printed the data requires a search of other events that occurred on the

17  computer in the time periods surrounding activity regarding the relevant data.   Information

18  about which user had logged in, whether users share passwords, whether the computer was

19  connected to other computers or networks, and whether the user accessed or used other

20  programs or services in the time period surrounding events with the relevant data can help

21  determine who was sitting at the keyboard.

22          e.      It is often difficult or impossible to determine the identity of the person

23  using the computer when incriminating data has been created, modified, accessed, deleted,

24  printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers

25  generate substantial information about data and about users which generally is not visible to

26  users.   Computer-generated data, including registry information, computer logs, user profiles

27  and passwords, web-browsing history, cookies and application and operating system metadata,

28  often provides evidence of who was using the computer at a relevant time.   In addition,

31

1 evidence such as electronic mail, chat sessions, photographs and videos, calendars and address
2 books stored on the computer may identify the user at a particular, relevant time. The manner
3 in which the user has structured and named files, run or accessed particular applications, and
4 created or accessed other, non-incriminating files or documents, may serve to identify a
5 particular user. For example, if an incriminating document is found on the computer but
6 attribution is an issue, other documents or files created around that same time may provide
7 circumstantial evidence of the identity of the user that created the incriminating document.

8        f.    Analyzing data has become increasingly time-consuming as the volume of
9 data stored on a typical computer system and available storage devices has become mind-
10 boggling. For example, a single megabyte of storage space is roughly equivalent of 500
11 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is
12 roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now
13 being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.
14 And, this data may be stored in a variety of formats or encrypted (several new commercially
15 available operating systems provide for automatic encryption of data upon shutdown of the
16 computer). The sheer volume of data also has extended the time that it takes to analyze data.
17 Running keyword searches takes longer and results in more hits that must be individually
18 examined for relevance. And, once reviewed, relevant data leads to new keywords and new
19 avenues for identifying data subject to seizure pursuant to the warrant.

20        g.    Based on the foregoing, identifying and extracting data subject to seizure
21 pursuant to this warrant may require a range of data analysis techniques, including hashing
22 tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data
23 from analysis, such as known operating system and application files. The identification and
24 extraction process, accordingly, may take weeks or months. The personnel conducting the
25 identification and extraction of data will complete the analysis within ninety (90) days of
26 imaging, absent further application to this Court.

27        h.    All forensic analysis of the imaged data will employ search protocols
28 directed exclusively to the identification and extraction of data within the scope of this warrant.

SW-000042

Genuine Risks of Destruction

i.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

j.    In this case, it is my belief that STEVEN MARTINEZ is currently aware of the criminal investigation. There is a genuine risk of destruction of the computer data relating to the tax returns of the above-referenced clients, especially those clients that have already made contact with STEVEN MARTINEZ concerning the falsely filed tax returns. In addition, there is a genuine risk of destruction of the forensic images that were returned to STEVEN MARTINEZ following his civil settlement with clients Anthony and Ann Capozza.

Prior Attempts to Obtain Data

k.    The United States has not attempted to obtain this data by other means.

User-Attribution

l.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating

33

SW-000043

1   document is found on the computer but attribution is an issue, other documents or files created

2   around that same time may provide circumstantial evidence of the identity of the user that

3   created the incriminating document.

4                        **V**

5                **REQUEST TO SEAL AFFIDAVIT**

6      100.   Because this is an ongoing investigation, your affiant requests this search warrant

7   affidavit be sealed until such time as the Court orders otherwise.   Disclosure of the search

8   warrant affidavit at this time would seriously jeopardize the ongoing investigation, as such

9   disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or

10   allow flight from prosecution.

11                        **VI**

12                   **CONCLUSION**

13      101.   Based upon my training and experience, I am aware that tax preparers use and

14   maintain records, documents, and files (written, printed, magnetic, and electronic) that are

15   evidence of criminal acts and reflect the receipt and disposition of illegally obtained proceeds

16   of income.

17      102.   Based upon my training and experience, I am aware that the principals involved

18   in this type of illegal financial fraud often use aliases, fictitious names, or false identification

19   cards to avoid detection.  I am also aware that these individuals very often place assets in names

20   other than their own (or in limited liability corporations, partnerships, or other legal entities) to

21   avoid detection of these assets by law enforcement agencies.   I am further aware that even

22   though these assets may repose in other persons' (or entities) names, these individuals act as the

23   beneficiaries, continue to use these assets, and exercise dominion and control over them.

24      103.   Based upon my training and experience, I am aware that tax preparers involved in

25   illegal financial frauds can amass large proceeds from these activities, and that these individuals

26   often attempt to legitimize these proceeds.  I know that to accomplish these goals, these

27   individuals often utilize a number of vehicles and mechanisms, including but not limited to:

28   //

34

1  foreign and domestic banks and their attendant services, securities, cashiers' checks, money
2  drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

3      104.   Based upon my training and experience, I am aware that individuals involved in
4  money laundering activities and other illegal financial frauds at times attempt to conceal
5  substantial wealth from law enforcement authorities, and in particular the IRS, if they have
6  acquired such wealth from illegal activities or are attempting to evade the proper tax liability
7  resulting from such wealth.

8      105.   Based upon my training and experience, I am aware that unexplained wealth is
9  probative evidence of crimes motivated by greed, including but not limited to: money
10  laundering, mail fraud, wire fraud, tax fraud, tax evasion, and aggravated identity theft.

11      106.   Based upon my training and experience, I am aware that it is customary for self-
12  employed tax preparers to retain financial records at various offices and warehouses.  Such
13  records can be stored in electronic or hardcopy form, including but not limited to: computer
14  printouts, computer disks, zip disks, hard drives, flash/thumb drives, and other memory storage
15  media.[1]  Such records also include audio recordings, telephone answering machine recording,
16
17

_____

18  [1]  Based on my experience and training, and discussions with other federal agents, I
19  know that to properly retrieve and analyze all electronically stored (computer) data, and to
20  insure accuracy and completeness of such data and to prevent the loss of the data either from
     accidental or programmed destruction, requires both on-site and laboratory analysis by a
21  qualified computer specialist.  To effect such accuracy and completeness requires the seizure of
22  all computer equipment and peripherals, the software to operate them, and related instruction
     manuals.  It should also be noted that the software with the computer is almost always used to
23  create the evidence and without manuals it may be difficult if not impossible to retrieve the
24  data.

25    According to IRS Special Agent David White, searches and seizures of evidence from
26  computers typically require an examination by a qualified computer expert in a laboratory or
     controlled environment.  This is almost always true because computer storage devices (like
27  floppy disks, hard diskettes, tapes, CD-ROMs, DVDs, flash medium and others) can store the
     equivalent of thousands of pages of information.  Especially when the user wants to conceal
28  criminal evidence, he or she often stores it in random order with deceptive file names.  This
     requires searching authorities to examine all the stored data to determine whether it is included

1  memoranda, correspondence, diaries, notes, address books, day planners, calendars,

2  appointment books, newspaper clippings, articles, books, financial institution records, checks,

3  cashiers' checks, money orders, wire transfer records, deposit slips, ATM receipts, certificates

4  of deposit, safety deposit slips, withdrawal slips, monthly and quarterly statements, stock

5  certificates, bonds, bearer instruments, notes, money market account statements, negotiable

6  orders of withdrawal, account documents, letters of credit, passbooks, drafts, title documents,

7  mortgage and loan documents, property records, storage agreements and bills, storage locker

8  keys, vehicle registration and ownership documents, asset ownership records, journals, ledgers,

9  code sheets, financials, budgets, proposals, plans, contracts, agreements, bills of sale, delivery

10  records, invoices, receipts, documentation of conveyances, deeds, and credit card bills and

11  other papers.  These records may be in many forms such as paper, electronic, or in code.  I

12  know from my experience that tax preparers use software, such as Quicken, to manage financial

13  records and investments, and use software, such as Lacerte, to prepare tax returns.

---

15  in the warrant.  This sorting process can take weeks or months, depending on the volume of

16  data stored, and it would be impractical to attempt this kind of data search on site.

17      In addition, searching computer systems for criminal evidence is a highly technical

18  process requiring expert skill and a properly controlled environment.  The vast array of

19  computer hardware and software available requires even computer experts to specialize in some

20  systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure

21  which is designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely

22  vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is

23  essential to its complete and accurate analysis.

24      In order to fully retrieve data from a computer system, the analyst needs all magnetic

25  storage devices as well as the Central Processing Unit (CPU).  In addition, the analyst needs all

26  the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard

27  drives or on external media).  A member of the IRS's Computer Team will accompany the

28  searching agents and, if possible, make an image of some or all of the computerized data storage devices will be done on-site to minimize the number of devices seized from the business.

SW-000046

107. Based upon my training and experience, I am aware that persons who own real estate often keep records of such purchases at their residences and their offices. These records include escrow, title, loan files, and deeds of trust, grant deeds, quitclaim deeds, reconveyance deeds, release deeds, mortgage records, and other documentation supporting conveyance and/or ownership of the properties. I know that persons who own real estate typically insure their property and possessions contained therein. I know those records include replacement value estimates, appraisals, and photographs of the properties and possessions. In addition, I know that persons that own real estate often make home improvements and additions to the properties, and typically, keep records of such improvements at their residences or their offices.

108. Based on my training and experience, I am aware that owners, managers, and operators of small businesses keep records at their business locations. These records include various accounting journals (e.g., sales, purchases, sales returns and allowances, adjusting journals) and business ledgers (e.g., trial balances, cash, accounts receivable, equipment, accounts payable and accrued expenses, payroll, and other subsidiary ledgers). In addition, I know that tax preparers who own and operate their own businesses frequently maintain a variety of records to manage their client records, cash, payroll, equipment, and tax situation. Similarly, they must also maintain various financial records such as bank statements, cancelled checks, invoices, sales receipts, and credit card statements in order to conduct their normal business activities.

109. Based upon my training and experience, I know that tax preparers who use laptop computers, disks, zip drives, external hard drives, flash/thumb drives, and other computer storage devices often transport such items between work and home so that they are accessible at any time.

110. Based upon my training and experience, I know that tax preparers who have engaged in financial fraud typically maintain books, records, receipts, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets, and the obtaining, secreting, transfer, concealment, and/or expenditure of money. Similarly, I know that tax preparers who have engaged in financial fraud often maintain records relating to their off-shore

SW-000047

1   banking activity (if they do, in fact, have such accounts).  In addition, I know that they typically

2   maintain addresses, appointment and/or telephone books and/or papers reflecting names,

3   addresses, telephone numbers and their meeting times.

4       111.   Based upon my training and experience, discussions with other federal agents and

5   witnesses, and the above listed facts, I believe probable cause exists that STEVEN MARTINEZ

6   is maintaining records involving his tax preparation business (including but not limited to

7   individual and entity tax returns, individual and entity financial records, evidence of estimated

8   tax payments, bank records, and credit card records).

9       112.   IRS Revenue Agent Douglas Sanderson has informed me that he has worked as a

10  Revenue Agent for 20 years.  In this capacity, he has audited hundreds of tax returns and had

11  extensive dealings with tax preparers.  Based on his experience and training, Agent Sanderson

12  stated that a tax preparer, such as STEVEN MARTINEZ, would maintain a large number of

13  books and records and tax returns in order to conduct his business activity and track his

14  finances for tax purposes.

15      113.   According to Agent Sanderson, these books and records and tax returns would

16  include: income tax returns (including Forms 1040, 1040A, 1040-EZ, 1040X, 1120, 1120S,

17  1065, 940, 941, DE-3); income tax information documents (including Forms 1099, W-2, W-4,

18  K-1), supporting work papers, summary sheets, and analyses; documents relating to any audits;

19  accounting journals (including general journals, cash receipts journals, cash disbursement

20  journals, sales journals, purchase journals, and payroll journals); general and subsidiary ledgers

21  (including payroll, accounts receivable, equipment, investments, accounts payable and accrued

22  expenses, sales, and purchases); charts of accounts, adjusting and closing entries, year-end trial

23  balances, entity minutes, bylaws, and entity formation documents; employee lists and employee

24  contracts; documents showing the receipt or disbursements of cash (including records of

25  royalties, credit card statements and receipts; invoices, records of commercial storage, cash

26  reconciliations, and records regarding any purchase or sale of assets); loan documents to or

27  from shareholders and related entities with payment history; other loan documents; inventory

28  records; financial statements; contracts (including contract bids and proposals); mortgage

SW-000048

1    records or other documentation supporting conveyances and/or ownership of property;

2    documents and records relating to other corporations, limited liability companies, partnerships

3    and other entities which have related ownership.

4        114.   According to IRS Agent Sanderson, a self-employed tax preparer/CPA, such as

5    STEVEN MARTINEZ, would typically maintain a large volume of records related to his tax

6    return preparation and accounting business and his personal banking activity.   Documents

7    related to the tax preparation and accounting business include, but are not limited to: income

8    tax information documents and tax returns, accounting journals, general and subsidiary ledgers,

9    cash receipts and disbursements journals, charts of accounts, adjusting and closing entries,

10   year-end trial balances, financial statements,  bank account statements, check ledgers, bank

11   reconciliations, entity minutes, employee lists and employee contracts, client lists, loan

12   documents and receipts and/or invoices for items purchased.   Personal banking activity

13   documents include, but are not limited to: bank statements, check registers, passbooks, deposit

14   and withdrawal slips, cancelled checks, certificates of deposit, notes, wire transfers, account

15   applications, negotiable instruments, safety deposit box records and keys; money drafts, letters

16   of credit, money orders, cashiers' checks and receipts for same, bank issued checks, and bank

17   reconciliations.

18       115.   Based on the facts above, my training and experience, and a review of the

19   documents and other relevant information that I believe to be reliable, I submit there is probable

20   cause to believe that STEVEN MARTINEZ is participating in and has participated in a

21   fraudulent scheme to defraud his clients, the IRS, and the FTB out of millions of dollars in

22   estimated taxes due and owing to the federal and state governments.

23       116.   Based on the facts above, my training and experience, and a review of the

24   documents and other relevant information that I believe is reliable, I submit there is probable

25   cause to believe that evidence, fruits and instrumentalities of violations of federal law,

26   including filing false tax returns, in violation of 26 U.S.C. § 7206; tax evasion, in violation of

27   26 U.S.C. § 7201; filing false claims with the United States, in violation of 18 U.S.C. § 287;

28   mail fraud, in violation of in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18

39

1  U.S.C. § 1343; money laundering, in violation of 18 U.S.C. § 1956 and § 1957; and aggravated

2  identity theft in violation of 18 U.S.C. § 1028A; as set forth in **Attachment B**, will be found at

3  the locations described in **Attachment A-1** and **Attachment A-2**.

4      117.  In consideration of the foregoing, I respectfully request that this Court issue a

5  search warrant for the locations described in **Attachment A-1** and **Attachment A-2** for the

6  items fully described in **Attachment B**.

7

8  Dated this ___ day of March, 2011

9                                    _____

10                                   Anthony Lysek

11                                   Senior Special Agent

12                                   U.S. Internal Revenue Service

13 Subscribed and sworn to before me

14 This 24 day of March, 2011, at San Diego, California.

15

16

17 _____

    HONORABLE WILLIAM MCCURINE, JR.

18 United States Magistrate Judge

    Southern District of California

19

20

21

22

23

24

25

26

27

28

SW-000050